725 F.2d 179
 Martin FINE, William Becker and Philip Becker, individually,
and William Becker and Philip Becker d/b/a Becker & Becker,
all doing business as 649 Broadway Equities Co.,
Plaintiffs-Appellees-Cross-Appellants,
v.
BELLEFONTE UNDERWRITERS INSURANCE CO.,
Defendant-Appellant-Cross-Appellee.
 Nos. 1547, 1548, Dockets 83-7188, 83-7198.
 United States Court of Appeals,
Second Circuit.
 Argued June 7, 1983.
Decided Jan. 3, 1984.
 
 1
 Herbert P. Polk, New York City (Robert S. Newman, of Whitman & Ransom, New York City, of counsel), for defendant-appellant-cross-appellee.
 
 
 2
 Andrew C. Jacobson, New York City (Frank A. Weg, Dennis T. D'Antonio, of Weg Meyers & Jacobson, New York City, of counsel), for plaintiffs-appellees-cross-appellants.
 
 
 3
 Before OAKES and MESKILL, Circuit Judges, and HILL,* District Judge.
 
 IRVING HILL, Senior District Judge:
 
 4
 In June 1978, Plaintiff, Fine,[1] purchased three contiguous parcels of land in New York City for a total price of $1,300,000. Each parcel had a building on it. Though the buildings had separate addresses (649, 653 and 657 Broadway), they were also contiguous and were operated as a single economic unit. The three buildings had a single heating system which employed a single boiler.
 
 
 5
 Following the purchase, Fine, through a broker, obtained a policy of fire insurance covering the three buildings (and other properties) from defendant Bellefonte Underwriters Insurance Co. (hereinafter "Bellefonte"). The policy was in the standard New York form.
 
 
 6
 At the time of Fine's purchase, the buildings were occupied by commercial tenants, some artists, and others who conducted light manufacturing and warehousing businesses. Fine desired to convert the buildings to residential use. Toward that end, after buying the buildings, he did not renew most expiring leases and he engaged in a "freeze-out" policy designed to minimize expenses and discourage tenants from remaining. The heat timer which controlled operation of the boiler, based in part on outside temperature, was set so that it would not start up the heating system until a sub-freezing temperature was reached. Additionally, the superintendent was told to turn off the heating system entirely from 11 a.m. to 2 p.m. each day regardless of the outside temperature. By February 1979, when the fire occurred, only about one-third of the premises remained occupied.
 
 
 7
 On February 14, 1979, a fire of unknown origin occurred which started in the 649 and 653 Broadway buildings and spread to 657 Broadway. The buildings at 649 and 653 Broadway were totally destroyed except for their facades and the building at 657 Broadway was substantially damaged.
 
 
 8
 On the night of the fire the sprinkler system in the buildings, which was the main fire protection device, did not operate. The sprinkler system was of the so-called wet pipe constant pressure type. In this type of system, pipes within the building are filled with water which is under pressure from gravity tanks. In addition, there are fittings outside the buildings at street level to enable the Fire Department to pump water from city mains into the system. The trial judge found that on the night of the fire, none of the sprinkler heads in the system worked. The Fire Department was unable to pump water into the system due to blockage in the pipes which the trial court found was "presumably" caused by ice. The trial court found that had the sprinklers functioned normally, the fire could have been controlled.
 
 
 9
 Fine submitted claims on the policy which Bellefonte, after investigation, denied. Bellefonte based its denial of liability on the assertion that three separate provisions of the policy had been breached, claiming that a breach of any one of the three would relieve it of liability. The three provisions were:
 
 
 10
 1. The so-called "Protective Maintenance Clause",[2] which is a warranty that "protective systems and warning devices" will be maintained in complete working order and will not be altered.
 
 
 11
 2. The so-called "Increased Hazard Clause",[3] which voids coverage if "the hazard is increased by any means within the knowledge of the insured."
 
 
 12
 3. The so-called "False Swearing Clause",[4] which provides that coverage is voided if, before or after a loss, the insured has willfully concealed or misrepresented any material fact concerning the insurance or the insured property, or in the event of any "fraud or false swearing by the insured" relating to any such material fact.
 
 
 13
 Fine filed the instant action against the insurer for payment of the loss. After a lengthy court trial, the trial court found in favor of Fine and against the insurance company and awarded a judgment of $1,214,221 for damage to the buildings[5] plus additional sums of $150,000 for loss of rental and $170,446.60 for debris removal. Bellefonte appeals, asserting that the trial court's failure to sustain each of its three separate defenses involved an error of law and was against the weight of the evidence. If, arguendo, Bellefonte is found liable, it also asserts that the trial court erred by adopting the wrong measure of damages. Fine cross-appeals from the trial court's refusal to award interest from the date of the fire to sixty days after the date when proof of loss was submitted.
 
 
 14
 We reverse on the ground that Fine violated the false swearing provision of the policy, thus voiding the coverage and the trial court's conclusion to the contrary cannot stand. It is therefore unnecessary for us to reach the other issues raised in connection with the appeal or the cross-appeal.
 
 THE FALSE SWEARING ISSUE
 
 15
 The fire occurred during an extended period of extremely cold weather. Outside temperatures averaged 10? Fahrenheit on the day of the fire. Bellefonte quickly learned, as reported by the Fire Department, that the sprinkler system in the buildings had failed to operate during the fire. The rapid spread of the fire and much of the loss was attributed to the non-operation of the sprinklers.
 
 
 16
 Bellefonte also became aware, early on, of Fine's decision to rid the buildings of the existing commercial tenants and of the tenants' complaints that he had instituted a freeze-out policy. Bellefonte was naturally very interested, not only in what caused the fire, but also whether a freeze-out policy was in effect and, if so, whether Fine's actions in pursuit of the freeze-out might have contributed to the failure of the sprinkler system. An obvious theory suggested itself, i.e., that there had been extremely low temperatures in the buildings before the fire which caused the pipes in the sprinkler system to freeze and that this was the result of conduct by the insured. The facts of which Bellefonte became quickly aware suggested the possibility that further investigation might establish a material breach of the protective maintenance clause or the increased hazard clause, or both.
 
 
 17
 With this in mind, Bellefonte conducted extensive examinations under oath of Mr. Martin Fine (the one owner, among the group of owners, in charge of operating the buildings), and of Mr. George Peters, managing agent for the owners. The examination of both dealt to a large extent with the instructions given and the provisions made for inspection and maintenance of the boiler heater and the sprinkler system, and particularly with the temperature setting employed on the heat timer that controlled the operation of the boiler.
 
 
 18
 The district court found that Fine and Peters each answered falsely during examination under oath. Both Fine and Peters stated in the examinations that they had charged the superintendent, a Mr. Aloisio, with the responsibility for inspecting and maintaining the sprinkler systems as he had been charged under the prior ownership. The trial court found such testimony to be false and that Aloisio had not been so charged or instructed.
 
 
 19
 During his examination, Mr. Fine testified that the nighttime setting for the heat timer controlling the boiler was 40 degrees and Mr. Peters testified that he had instructed superintendent Aloisio to set the heat timer at 40 degrees for nighttime operation. The trial court found that the testimony of both men was false in this respect. The court found that Aloisio had been instructed by Peters personally to set the heat timer at 25 degrees for nighttime and that Aloisio had, despite such instruction, set it for 30 degrees.
 
 
 20
 Despite the aforesaid findings of falsity, the trial court rendered judgment for Plaintiffs on the false swearing defense on the ground that the false statements were not material.
 
 
 21
 Under the heading, "Conclusions of Law", the trial court said:
 
 
 22
 "Here the statements were not material to the investigation. Given the extreme temperatures during the period from February 5th to February 14 as noted above, whether the heat timer setting was 25 degrees, 30 degrees or 40 degrees would not have affected the operation of the heating system. Further there was no testimony that a 25 degree or 30 degree setting would have constituted a practice which would have reasonably been foreseen to result in a freezing condition, which, in turn would have made the sprinkler system inoperative."
 
 
 23
 "Similarly with respect to the sprinkler maintenance issue, whether Aloisio was instructed to perform maintenance on the sprinkler system or not, in fact he did take the action necessary to repair the system, and there is no indication in this record that any failure of record keeping or regular maintenance was in any way responsible for the freeze-up. Since the Fine policy of freeze-out has not been proved to be the cause of the freeze-up, the false statements, viewing them as such, were not material as contemplated under section 168 [of New York Insurance Law]."
 
 
 24
 (App. p. A-388-89).[6]
 
 
 25
 The standard or test by which to measure the materiality of a statement is sometimes regarded as a pure question of law and sometimes regarded as a mixed question of law and fact. In this case, where the statements were admittedly made and the finding of their falsity is not attacked on appeal, the question seems to be purely one of law which we may consider on appeal without reference to the "clearly erroneous" requirements of Fed.R.Civ.P. 52(a).[7] We conclude that the standard or test of materiality adopted by the trial judge in the above quoted language was erroneous.
 
 
 26
 The trial judge regarded the materiality of the false statements as being dependent upon the ultimate determination of the facts concerning the fire as they were finally revealed to the court after a trial lasting many weeks. As the trial judge analyzed it, if it turned out, after a trial, that the sprinkler system would have been inoperative anyway on the night of the fire for reasons unrelated to the subject of the false statements, false statements about the setting of the heat timer and about maintenance and inspection of the sprinkler system made during the company's earlier investigation became immaterial. To make such statements material, the trial judge appears to reason, the insurer would have had to prove at the trial that the setting of the heat timer or a failure of maintenance of the sprinkler system caused the pipes to freeze and the sprinklers to be inoperative on the night of the fire.
 
 
 27
 In our view, the trial judge's definition of materiality was far too restrictive and not in accordance with long-established case law.
 
 
 28
 The issue is: Is a false statement material only if it relates to a matter or subject which ultimately proves to be decisive or significant in the ultimate disposition of the claim, or is it sufficient that the false statement concerns a subject reasonably relevant to the insurance company's investigation at the time? The law is clear that the materiality of false statements during an insurance company investigation is not to be judged by what the facts later turn out to have been. The purpose of a provision requiring an insured to submit to an examination under oath is to enable the insurance company to acquire knowledge or information that may aid it in its further investigation or that may otherwise be significant to the company in determining its liability under the policy and the position it should take with respect to a claim. Thus the materiality requirement is satisfied if the false statement concerns a subject relevant and germane to the insurer's investigation as it was then proceeding.
 
 
 29
 One hundred years ago, in the seminal case of Claflin v. Commonwealth Insurance Co., 110 U.S. 81, 3 S.Ct. 507, 28 L.Ed. 76 (1884), the Supreme Court stated:
 
 
 30
 The object of the provisions in the policies of insurance, requiring the assured to submit himself to an examination under oath, to be reduced to writing, was to enable the company to possess itself of all knowledge, and all information as to other sources and means of knowledge, in regard to the facts, material to their rights, to enable them to decide upon their obligations, and to protect them against false claims. And every interrogatory that was relevant and pertinent in such an examination was material, in the sense that a true answer to it was of the substance of the obligation of the assured. A false answer as to any matter of fact material to the inquiry, knowingly and willfully made, with intent to deceive the insurer, would be fraudulent. If it accomplished its result, it would be a fraud effected; if it failed, it would be a fraud attempted.... No one can be permitted to say, in respect to his own statements upon a material matter, that he did not expect to be believed; ... their materiality, in the eye of the law, consists in their tendency to influence the conduct of the party who has an interest in them and to whom they are addressed.
 
 
 31
 110 U.S. at 94-95, 3 S.Ct. at 514-15 (emphasis supplied).
 
 
 32
 As the Tenth Circuit said in a recent case: Regarding allegations of false swearing, a misrepresentation will be considered material if a reasonable insurance company, in determining its course of action, would attach importance to the fact misrepresented.
 
 
 33
 Long v. Insurance Co. of North America, 670 F.2d 930, 934 (10th Cir.1982).
 
 
 34
 In Chaachou v. American Central Insurance Co., 241 F.2d 889 (5th Cir.1957), the Fifth Circuit, in dealing with a fire policy in the standard New York policy form, confronted a materiality question much like the issue before us. That court marshalled the authorities and two authorities quoted with approval in Chaachou[8] are particularly relevant.
 
 
 35
 If the plaintiffs knowingly and wilfully, with intent to defraud the defendants, swore falsely in making the proofs of loss, such act amounted to a fraud upon the defendants which avoided the policies, irrespective of the ultimate effect upon the defendants.
 
 
 36
 Meyer v. Home Insurance Co., 127 Wis. 293, 299-300, 106 N.W. 1087, 1089 (1906).
 
 
 37
 The fatal effect, however, of a willful misstatement of fact is not disturbed because of the failure of the company to prove that prejudice was thereby occasioned....
 
 
 38
 3 W. Freedman, Richards on Insurance Sec. 510, at p. 1654 (5th ed. 1952).
 
 
 39
 It thus appears that materiality of false statements is not determined by whether or not the false answers deal with a subject later determined to be unimportant because the fire and loss were caused by factors other than those with which the statements dealt. False sworn answers are material if they might have affected the attitude and action of the insurer. They are equally material if they may be said to have been calculated either to discourage, mislead or deflect the company's investigation in any area that might seem to the company, at that time, a relevant or productive area to investigate.
 
 
 40
 Therefore, when measured by the proper standard and definition, each of the instant false statements was clearly material. As noted above, Bellefonte was investigating a plausible theory reasonably derived from the available facts, one which would result in the voiding of its coverage. The questions were material to that investigation. It is irrelevant whether Bellefonte was ultimately able to muster sufficient evidence to prove its theory at trial.
 
 
 41
 Bellefonte was entitled to prevail on its defense that false swearing by the insured voided the policy. The judgment of the district court is therefore REVERSED. The case is remanded to the district court with instructions to enter judgment for the defendant.
 
 
 
 *
 Honorable Irving Hill, Senior United States District Judge for the Central District of California, sitting by designation
 
 
 [1]
 The Plaintiffs in this action are Martin Fine, William Becker and Philip Becker, and William Becker and Philip Becker d/b/a as Becker and Becker. Plaintiffs collectively did business as 649 Broadway Equities Co. Plaintiffs collectively are herein referred to for convenience as "Fine"
 
 
 [2]
 The language of this policy provision is as follows:
 Protective Maintenance. It is warranted that the insured shall maintain in complete working order such protective systems and warning devices as existed at time of attachment of this policy, or which the insured has agreed to install, insofar as it is under the insured's control or supervision, and that no change shall be made in the said protective systems and warning devices without the consent in writing of this company. (App. p. A-260)
 
 
 [3]
 The language of this policy provision is as follows:
 Conditions suspending or restricting insurance. Unless otherwise provided in writing added hereto this Company shall not be liable for loss occurring (a) while the hazard is increased by any means within the control or knowledge of the insured .... (App. p. A-262).
 
 
 [4]
 The language of this policy provision is as follows:
 Concealment, fraud. This entire policy shall be void if, whether before or after a loss, the insured has wilfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interest of the insured therein, or in case of any fraud or false swearing by the insured relating thereto. (App. p. A-262)
 
 
 [5]
 Four months after the fire the three properties were sold in their fire-damaged condition for $2 million with the sellers apparently retaining all rights to recovery under the policy
 
 
 [6]
 Section 168(6) of the New York Insurance Law prescribes the exact language to be used in a standard fire insurance policy in New York state, including the exact language of the section on false swearing. The statutory language was followed in the instant policy. Insurance statutes in all or nearly all of the states prescribe a standard fire insurance policy including the exact language to be employed therein. R. Keeton, Basic Text on Insurance Law 70 (1971). Of those who do, almost all use the New York form, including its exact "False Swearing Clause". INS.L.REP. Fire & Casualty Cas. (CCH) pp. 2002 (Dec. 6, 1972), 2003-04 (Nov.1982), 2007-10 (Apr.1982)
 
 
 [7]
 But even if the question as posed in this case is regarded as a mixed question of law and fact, Fed.R.Civ.P. 52(a) would not preclude this Court from its own independent consideration. United States v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948); Karavos Compania Naviera, S.A. v. Atlantica Export Corp., 588 F.2d 1 (2nd Cir.1978); First National Bank of Cincinnati v. Pepper, 547 F.2d 708 (2nd Cir.1976)
 
 
 [8]
 241 F.2d at 894 n. 6