**Paul DADURIAN, Plaintiff, Appellee,**

v.

**UNDERWRITERS AT LLOYD'S, LONDON, Defendant, Appellant.**

No. 85–1239.

United States Court of Appeals, First Circuit.

Argued Sept. 6, 1985.

Decided April 2, 1986.

Rehearing Denied April 23, 1986.

Herbert P. Polk with whom Whitman & Ransom, Deming E. Sherman and Edwards & Angell were on brief, for defendant, appellant.

Richard C. Tallo, for plaintiff, appellee.

Before CAMPBELL, Chief Judge, BOWNES, Circuit Judge, and CEREZO,* District Judge.

LEVIN H. CAMPBELL, Chief Judge.

This diversity case arose out of the refusal of defendant-appellant Lloyd's, London ("Lloyd's")[1] to indemnify plaintiff-appellee Paul Dadurian after he claimed the loss of certain jewelry that he allegedly owned and that had been insured under a Lloyd's insurance policy. As affirmative defenses to the suit for nonpayment, Lloyd's asserted that Dadurian's claim was fraudulent and that Dadurian had knowingly made false statements about facts material to his claim. The jury entered special verdicts favorable to Dadurian, resulting in his recovering $267,000 plus interest. Lloyd's moved for judgment notwithstanding the verdict, or alternatively, for a new trial. The United States District Court for the District of Rhode Island denied the

---

* Of the District of Puerto Rico, sitting by designation.

1. By stipulation, the name "James McGettrick, one of the Underwriters at Lloyd's London, Subscribing Policy No. DO 8401/DJ 0009800" was substituted for "Underwriters at Lloyds, London," the defendant originally named.

motion, and Lloyd's now appeals. As we find the jury's verdict was against the great weight of the evidence, we vacate and remand for a new trial.

## I.

Dadurian claimed that he purchased 12 pieces of "specialty" jewelry for investment purposes over a period of 30 months, from August 1977 to January 1980. The pieces allegedly ranged in price from $12,000 to $35,000, costing him $233,000 in total. Dadurian testified that he purchased all the jewelry from James Howe, a jeweler in Providence, Rhode Island, and paid for each item in cash. Dadurian did not present any sales slips, receipts or other documents of transfer reflecting any of his alleged purchases; and Howe not only presented no records of his sale of the jewelry to Dadurian, but he could not remember from whom he had originally obtained the jewelry and had no records showing that the jewelry had ever actually been in his possession.

On or about March 2, 1980, Dadurian purchased a "Jewelry Floater" policy from Lloyd's, which insured him against loss of the 12 items of jewelry. The jewelry pieces were described on an attached schedule, which also set forth the maximum amount recoverable for each piece. The maximum recoverable under the policy was $267,000. Dadurian obtained the insurance coverage on the strength of eight appraisal certificates for the jewelry, which were prepared by Howe at Dadurian's request. Some certificates were dated on the same day as certain of the alleged purchases, while others were dated months later.

Dadurian claimed that on or about April 12, 1980, armed robbers entered his home and forced him to open his safe, where the jewelry was kept. He was shot in the right shoulder, allegedly by one of the robbers, and was taken to the hospital. It is Dadurian's contention that the insured pieces of jewelry were stolen during the robbery. After preliminary investigation by an adjuster representing Lloyd's, Dadurian was asked to appear for a formal examination under oath by counsel for Lloyd's. The examination took place on September 10, 1980, and again on May 28, 1981. Because of alleged false and fraudulent statements made under oath by Dadurian at this examination, Lloyd's refused to indemnify Dadurian for the claimed losses.

On March 31, 1982, Dadurian brought this action in the district court seeking compensation for his losses under the jewelry insurance policy issued by Lloyd's.[2] The action was tried before a jury from October 29 through November 5, 1984. The jury rendered four special verdicts, all favorable to Dadurian: that Dadurian had been robbed on April 12, 1980; that he had not given false answers or information on any material subject when he was examined under oath before the commencement of this suit; that he had not made any false statement or fraudulent claims as to any of the 12 jewelry items for which he claimed a loss; and that the total fair market value of all the jewelry on April 12, 1980, was $267,000. Judgment was entered for plaintiff in the amount of $267,000 with interest.

Pursuant to Fed.R.Civ.P. 50, Lloyd's moved for judgment n.o.v. or, in the alternative, for a new trial. The district court denied defendant's motion, and this appeal followed.

## II.

Lloyd's argues on appeal that Dadurian swore falsely, and necessarily knowingly, with respect to at least two key issues, and that either instance of false swearing was sufficient to void the insurance policy. First, Dadurian is said to have clearly lied in asserting that he purchased and owned the 12 pieces of jewelry for which he later obtained the insurance; and second, he is said to have knowingly lied in telling

2. In Counts II and III of the complaint, Dadurian also sought damages for emotional distress, bad faith in dealing, and tortious interference with his property interests. At the close of plaintiff's case, the district court granted defendant's motion for a directed verdict as to these counts. Dadurian has not appealed.

Lloyd's, at the formal examination under oath conducted before this action was begun, that the cash he used to purchase the jewelry came from certain bank loans. Lloyd's contends that evidence presented at trial was so overwhelmingly against Dadurian on both these issues that no reasonable jury could have rendered a verdict in his favor.

## A. *The Purchase of the Jewelry*

■ Pointing to the suspicious absence of documentation for any of the jewelry purchases, Lloyd's asserts that the record shows that Dadurian had sworn falsely when he testified to having purchased the jewelry at all. Dadurian procured the Lloyd's insurance on the basis of written appraisals executed by Howe, the man from whom he allegedly purchased all 12 pieces. But he obtained no receipts nor did Howe have any records of the alleged sales to Dadurian. Moreover, although Dadurian testified to specific dates and prices paid for each of his jewelry purchases, in support of his story of ownership, his testimony that he had obtained that information from Howe's records was contradicted by testimony that Howe kept no such records.

But whatever may be thought of Dadurian's story, we cannot say, as a matter of law, that no jury could have properly found that Dadurian had purchased the jewelry as he claimed. *See, e.g., Insurance Company of North America v. Musa,* 785 F.2d 370, 372 (1st Cir.1986) (discussing strict standard for judgment n.o.v.). Nor can we say the verdict on this issue was so far contrary to the clear weight of the evidence as, by itself, to provide grounds for our ordering the district court to grant a new trial. *See, e.g., Lakin v. Daniel Marr & Son Co.,* 732 F.2d 233, 237 (1st Cir.1984). Not only did Howe testify at trial that he sold each

one of the jewelry pieces to Dadurian at the prices Dadurian claimed, but Howe's employees, Cheryl Cousineau and Edward Proulx, gave testimony which, in material respects, tended to support the story that Dadurian purchased at least some jewelry items from Howe with cash. And Howe and Cousineau testified that they did not usually give receipts for cash purchases of "investment jewelry" or of jewelry sold "on consignment," thus tending to explain why Dadurian had no receipts. Despite extensive cross-examination by counsel for Lloyd's, the jury apparently chose to credit the testimony of Dadurian and his witnesses, and the jury was entitled to overlook the lack of any documentation for the purchases.

## B. *The Source of the Funds*

■ Lloyd's also argues that Dadurian knowingly lied under oath at the formal examination when he swore that certain specific bank loans were the source of the cash he used to buy the jewelry. If Dadurian swore falsely and knowingly on this issue, he is not entitled to recover under the insurance contract. This is so because under the Lloyd's policy Dadurian was required to give "such information and evidence as to the property lost and the circumstances of the Loss as the Underwriters may reasonably require and as may be in the Assured's power"—and it is undisputed that under the policy,[3] as well as under established case law,[4] knowingly false testimony by Dadurian as to any fact considered "material" to his claim voids the policy.

The district court instructed the jury, and Dadurian does not dispute, that the issue of where he obtained the cash used for his jewelry purchases was "material" to his claim. To be considered material, a statement need not "relate[ ] to a matter or

---

**3.** The policy also stated that: "If the Assured shall make any claim, knowing the same to be false or fraudulent, as regards amount or otherwise, this insurance shall become void, and all claims thereunder shall be forfeited."

**4.** *See, e.g., Claflin v. Commonwealth Insurance Co.,* 110 U.S. 81, 3 S.Ct. 507, 28 L.Ed. 76 (1884); *Fine v. Bellefonte Underwriters Insurance Co.,* 725 F.2d 179 (2d Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 233, 83 L.Ed.2d 162 (1985); *Murray v. State Mutual Life Insurance Co.,* 22 R.I. 524, 48 A. 800 (1901).

subject which ultimately proves to be decisive or significant in the ultimate disposition of the claim"; rather, it is sufficient if the statement was reasonably relevant to the insurance company's investigation of a claim. *Fine v. Bellefonte Underwriters Insurance Co.*, 725 F.2d 179, 183–84 (2d Cir.1984), *cert. denied*, — U.S. —, 105 S.Ct. 233, 83 L.Ed.2d 162 (1985). We agree that where Dadurian got the cash was material to his insurance claim, since Dadurian insisted that he paid Howe a total of $233,000 in cash over a 30-month period for the jewelry, and the credibility of this story, and hence of Dadurian's ownership of the insured items, turned in part on his ability to explain plausibly where he obtained such large sums of cash.[5]

The details of Dadurian's testimony about the bank loans are as follows: Soon after the alleged robbery of the jewelry items in April 1980, Dadurian was interviewed by an adjuster for Lloyd's. At this initial interview Dadurian, to explain the sources of his cash, stated that he "may have borrowed from the bank for the purchase of certain of the personal items of jewelry and [would] check [his] records in this regard." He later submitted to Lloyd's certain promissory notes which he contended represented the bank loans used to finance many of his purchases. Apparently still dissatisfied with the information provided by Dadurian, Lloyd's notified Dadurian in a letter dated August 18, 1980, that he would be required to appear at a formal examination under oath for further questioning at which time he "should be prepared to produce ... all documents in any way relating to the occurrence of the loss...."

At the first examination session on September 10, 1980, and again at the second session on May 28, 1981, when he was examined under oath by counsel for Lloyd's,[6] Dadurian testified to the effect that most of his cash had come from loans from the Rhode Island Hospital Trust National Bank ("Hospital Trust").[7] During the two sessions, Dadurian was specifically questioned in turn about the sources of the cash used to purchase each · one of the jewelry pieces. For 11 of the 12 items, Dadurian identified the individual promissory notes of his—by date and by loan amount—that purportedly represented the bank loans he said was used to finance his purchases. In total, he identified 13 specific bank loans as the source of $166,000 of the $233,000 which he claimed to have paid to Howe.[8]

At trial, however, Richard Niedzwiadek, an employee of the bank, testified that the loans associated with four of the jewelry pieces, totalling $49,500, were simply renewals of earlier loans which could not

---

5. Lloyd's was understandably interested in hearing Dadurian's explanation of the source of his cash, particularly when it discovered that in 1978, the year Dadurian allegedly bought four of the twelve jewelry items for a total of $90,000 in cash, his income as reported in his federal tax return was only about $3,000.

6. Dadurian was represented by an attorney at the first of the two examination sessions. Before the second session, however, Dadurian apparently discharged his attorney and chose not to have an attorney present at the May 1981 examination.

7. Dadurian testified during his September 1980 examination as follows:

   If you want to know how I wound up with the cash, how all this jewelry was paid up in cash, how I got all the cash for the jewelry, the insurance company has copies of these. (indicating) These are all bank notes. When a good piece of jewelry came along for the right price, which I had to pay for in cash, I went to the bank. I borrowed from the bank, borrowed the money on notes, and the [insurance] company has these copies which you may take them if you like, and you may make copies of them. That's how I purchased the jewelry.

   .    .    .    .    .    .

   I have a quarter of a million dollars loss, and the money came from here from bank notes. I still owe this bank. I borrowed this money, and it's as simple as that.

8. Based on this testimony, Lloyd's subsequently prepared a chart, listing the purchase date and claimed cost of each one of the 12 jewelry items, as well as the claimed source of cash for each. This chart was admitted into evidence, and Dadurian confirmed at trial that the chart accurately reflected his testimony at the formal examination.

have generated any cash for Dadurian. He also produced bank statements for Dadurian's accounts at Hospital Trust showing that the proceeds from several other loans which Dadurian had identified as having financed a number of the jewelry pieces had been deposited in those accounts and then withdrawn in too small amounts over a period of time to have been used for purchasing the jewelry as Dadurian claimed. Niedzwiadek further testified that the proceeds of yet another loan supposedly associated with a jewelry item had been deposited in the corporate account of a company named U.S. Enterprises, Inc., and that Dadurian had stated the purpose of the loan as "real estate investment." [9] Confronted with this cumulative evidence, Dadurian essentially conceded that some, if not most, of the promissory notes he had selected had been the wrong ones, and that his testimony as to the sources of the funds was therefore in part false. He insisted, however, that he had selected the notes "to the best of [his] recollection" and that he had been honestly mistaken.

Since it is thus uncontroverted that a substantial number of Dadurian's representations under oath about the sources of his cash were untrue, the only remaining question is whether Dadurian made these false statements *knowingly* or whether he was simply mistaken in good faith as he claims. False swearing is "swearing knowingly and intentionally false and not through mere mistake." *Black's Law Dictionary* 725 (rev. 5th ed. 1979). Lloyd's forcefully contends that where Dadurian testified with such certainty, yet incorrectly, about so many of his own promissory notes and bank loans, the inference of intentional falsehood is so compelling as to render the jury's finding contrary, at very least, to the great weight of the evidence.

After carefully considering the entire record, we find that the great weight of the evidence indicates overwhelmingly that Dadurian knew he was giving false testimony. At the formal examination under oath Dadurian specifically identified 13 promissory notes, apparently from those he had given Lloyd's sometime before the examination, and explicitly linked each note to a particular jewelry purchase. He did not qualify his identifications, but rather couched his testimony in terms of misleading certainty. Only when confronted at trial with the patent falsity of his earlier testimony did Dadurian testify, by way of explanation, that he had made his selections only to the "best of his recollection" in order to satisfy the insurance company's inquiries. It was only then that he explained that because he had "files and files" of such notes in his possession,[10] he must have simply selected the wrong ones under pressure of time and circumstances.

This explanation strains credulity. This was not a case where Dadurian was confronted for the first time at the examination with "files and files" of his promissory notes and asked to come up with correct ones "on the spot." Rather it was Dadurian himself who originated and put forward the story that most of his cash had come from bank loans, and it was Dadurian who apparently first tendered the supposedly relevant promissory notes to Lloyd's at some time before the formal examination. Dadurian admitted at trial that he had known before the first examination session that he would be questioned further about the bank loans. He apparently marked each of the notes before the examination sessions with the number of the jewelry piece with which it was supposedly associated. By the first session in September 1980, and certainly by the May 1981 session, Dadurian had had ample notice as

---

**9.** According to the bank records presented at trial, Dadurian did not state the purchase of jewelry as the purpose for obtaining any of the bank loans; and for four of the nine non-renewal loans, Dadurian specifically stated that he would use the loans for real estate investment, working capital, or his used car business.

**10.** At one point in his testimony at trial, Dadurian stated that he had "maybe ... 50, 60, 70 notes" in his possession.

well as opportunity to discover the correct promissory notes or, if he found he was wrong or in doubt, to say so. The uncontested facts simply belie Dadurian's excuse that he was pressured into making identifications prematurely.

Dadurian had much to gain by providing a plausible explanation for the sources of his cash. By piecing together notes executed on dates close to the times of the alleged purchases, he could hope to create an impression of credibility. That he linked the notes to the jewelry purchases so positively—without bothering to ascertain readily available information showing that they were not so related—indicates, at the least, a wilful misrepresentation as to the state of his own knowledge concerning the matters to which he was testifying. We think the only fair inference from this kind of total indifference to the truth or falsity of his assertions was that Dadurian knew that he was not telling the truth. *See* W. Prosser & W.P. Keeton, *The Law of Torts* § 107, at 740–42 (5th ed. 1984) (discussing law of misrepresentation).

It follows, we believe, that the jury's verdict was against the clear weight of the evidence insofar as it found that Dadurian did not knowingly give false answers or information on any material subject when he was examined under oath before commencement of this suit.[11] We emphasize that Dadurian himself conceded that some of his answers were incorrect, and it is clear the district court properly found them "material." This leaves open only the question of their possible innocence, which, to be sure, Dadurian attested to—but with implausible explanations as to why he put forward these patently unfounded and incorrect assertions. We conclude that the jury's finding that Dadurian did not give knowingly false answers was contrary to

the great weight of the evidence. For that aspect of the verdict to stand would, in our view, amount to a manifest miscarriage of justice. *See, e.g., Hubbard v. Faros Fisheries, Inc.,* 626 F.2d 196, 200 (1st Cir.1980). We hold, therefore, that the district court abused its discretion in denying defendant's motion for a new trial, and remand the case for retrial by a new jury.

■ We are mindful of the alternative plea by Lloyd's that we should reverse the court's refusal to grant a judgment n.o.v. and, in effect, direct a finding for Lloyd's rather than order a new trial. Whether to do so is a very close question. A factor weighing against this alternative is that Lloyd's had the burden of proving that Dadurian was lying, and this circuit, like most courts, is reluctant to direct a verdict for the party having the burden of proof. *See Insurance Company of North America v. Musa,* 785 F.2d 370, 372–73 (1st Cir.1986); *Mann v. Cannon,* 731 F.2d 54, 55 (1st Cir.1984); *Arnold v. Aetna Engineering Co.,* 514 F.2d 1147, 1148 (1st Cir. 1975) (per curiam). The issue, moreover, involves a determination of credibility. Hence, even though we find it hard to see how a reasonable jury could reach any result other than that Dadurian was knowingly lying, we believe that the more appropriate relief is a new trial.

■ A remaining question is whether the new trial should encompass both the issue of Dadurian's ownership of the jewelry and the issue of his knowingly false testimony as to the sources of his funds. We hold that it should, even though it was on the latter issue that the district court erred. Dadurian's credibility is cast into serious doubt by our finding that the clear weight of the evidence shows that he must have

---

**11.** It strikes us that the jury may not have paid sufficient attention to determining whether Dadurian had knowingly lied as to the sources of his cash. There were many issues raised at trial. Once the jury concluded that Dadurian had indeed purchased the jewelry as he alleged, it could have thought that the issue of Dadurian's false swearing as to the bank loans was a mere technicality. But, as we discussed, a finding that Dadurian had knowingly given false testimony as to *any* material fact voids the policy just as a finding that Dadurian had not owned the jewelry would have voided it. It is possible that the jury, despite instructions in the jury charge to the contrary, decided on its own that since Lloyd's had insured the jewelry it should pay for its loss, regardless of whether Dadurian lied as to the source of his funds.

knowingly lied about a material issue. It follows that this loss of credibility necessarily affects the jury finding in Dadurian's favor on the issue of his jewelry purchases, since Dadurian was his own main witness for all aspects of his story. A new trial as to both issues also makes sense since the issue of where Dadurian obtained the cash to make his purchases is so interrelated with the question of whether Dadurian bought the jewelry he claimed as to make it difficult to hold a meaningful trial on the first without the second.

*Vacated and remanded for a new trial.*