**PACIFIC INDEMNITY COMPANY,**
**Plaintiff–Appellee,**

v.

**Donald GOLDEN, Defendant–Appellant.**

**No. 363, Docket 92–7599.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 20, 1992.

Decided Jan. 27, 1993.

Kenneth R. Feit, New York City (Franklin D. Tell, Alfred C. Polidore, Tell, Cheser & Breitbart, New York City, of counsel), for plaintiff-appellee.

Dennis T. D'Antonio, New York City (Michael P. Lagnado, Weg and Myers, P.C., New York City, of counsel), for defendant-appellant.

Before: KEARSE and MINER, Circuit Judges, and POLLAK, District Judge *.

---

* Hon. Louis H. Pollak, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

MINER, Circuit Judge:

Defendant-appellant Donald Golden appeals from an amended judgment entered in the United States District Court for the District of Connecticut (Eginton, *J.*) awarding plaintiff-appellee Pacific Indemnity Company ("Pacific") $2,191,821.78. Pacific brought this action in the district court for a declaration that it had no liability to Golden for a fire loss under the terms of an all-risk insurance policy it had issued to Golden, and for damages against Golden for reimbursement of all monies paid by Pacific in accordance with the terms of the policy. The district court granted summary judgment for Pacific, declaring that Golden had made material misrepresentations during an informal interview with a representative of Pacific and therefore had violated the "Concealment or fraud" provision of the insurance policy. *See Pacific Indem. Co. v. Golden,* 791 F.Supp. 935 (D.Conn.1991). Pacific then moved for an order amending the judgment to include the sums disbursed to Golden's mortgagee. The district court granted the motion and the judgment was amended to include the money award. For the reasons that follow, we hold that the district court erred in granting Pacific summary judgment, and we remand the case to the district court for further proceedings consistent with this opinion.

## BACKGROUND

Donald Golden was the owner of a house at 12 Stallion Trails, Greenwich, Connecticut, which was insured under an all-risk Chubb "Masterpiece" Insurance Policy, number 10231998–01, issued by Pacific, a member of The Chubb Group of Insurance Companies. The policy covered loss or damage to the premises during the period April 11, 1988 to April 11, 1989 and provided that "[w]e do not provide coverage if you or any covered person has intentionally concealed or misrepresented any material fact relating to this policy before or after a loss."

On December 2, 1988, Golden's house was severely damaged by fire. Golden learned of the fire when a neighbor telephoned him at his girlfriend's residence in New Jersey. Golden returned to the property while the house was still in flames. Upon his arrival at the scene, he immediately advised the fire marshal that a quantity of gasoline was stored in a room located at the opposite end of the premises from where the fire started. As a result of Golden's warnings, the firemen removed the gasoline without incident. The gasoline was stored in two plastic garbage cans (each with a capacity of approximately thirty-two gallons) and in two smaller containers (each with a capacity of approximately two-and-one-half gallons). When questioned at the scene by the fire marshal about his reason for storing such large quantities of gasoline in his house, Golden replied that the gasoline was to be used in snowmobiles that he and his neighbor, John Napoli, owned. Golden repeated this story to the police the following day. The fire marshal initially concluded that Golden's sophisticated fire alarm system did not sound because of fire damage to an electrical panel. In addition, although the investigation was continuing and laboratory results had not yet been obtained, the fire marshal's initial report indicated that the fire had been deliberately set by a person or persons unknown, probably by using gasoline as an accelerant.

On December 12, 1988, as part of Pacific's investigation into the cause and origin of the fire, Chubb's National Manager of Special Claims Investigations, Beverly Ascolese, conducted a tape-recorded interview of Golden. Golden, who was not under oath and who did not have counsel present at the time, was advised by Ascolese that he would be able to verify his statements and make any necessary corrections when he received a transcript of the interview.

During the interview, Golden maintained that the gasoline had been brought into his house with his consent by workmen employed by Napoli in February 1988. Golden also repeated his earlier claim that he and Napoli intended to use the gasoline for their snowmobiles. Although his statement was true with respect to the gasoline in the smaller containers, it would prove to be false with respect to the gasoline in the garbage cans.

As part of her investigation of Golden's claims, Ascolese conducted several interviews in an unsuccessful attempt to verify Golden's statement that gasoline had been stored at his residence since February 1988. Sometime in January 1989, Ascolese interviewed Angela Tomanio, an appraiser, who had inspected the premises almost six months before the fire on behalf of Pacific. Tomanio denied knowledge of the gasoline's presence. On January 30, 1989, Ascolese interviewed "Arienne," a real estate agent employed by a broker who was retained by Golden in October 1988 to sell the house. Although she had shown Golden's property on at least three occasions, Arienne denied any knowledge of the gasoline and asserted that she had never been in the room where the gasoline had been stored. On January 31, 1989, Ascolese interviewed Tim Brown, an insurance agent employed by the William Thayer Shedd Agency, who sold Golden the Pacific policy. Brown said that he had never been in Golden's house and had no personal knowledge that gasoline was being stored there. Brown also said that, after the fire, Golden expressed his concern that he would be blamed for the fire because of the gasoline at the premises and because the insurance recently had been increased. Finally, on February 14, 1989, Ascolese interviewed Dave Miles, a sales representative for Sonitrol Alarm Systems, the company that upgraded Golden's alarm system in May and June of 1988. During the upgrade of the alarm system, Miles was present in the room where the gasoline had been stored but did not observe any gasoline there. Pacific does not contend that the conduct of these interviews or the course of its investigation would have gone forward in a different manner if Golden's misrepresentations had been known.

As part of Pacific's continuing investigation, and in compliance with the policy's provisions, Golden on January 26, 1989 submitted to an examination under oath. The

examination was continued on March 17, 1989. At the March session, when he was first questioned about the gasoline-filled containers, Golden testified that his earlier representations to the fire marshal and to Ascolese had been false, and that he had in fact brought the containers into his house in November 1988 for the purpose of poisoning Napoli's lawn with the gasoline. Golden claimed that Napoli had defrauded him of 1.2 million dollars and that his motive for poisoning Napoli's lawn was revenge. Golden already had recovered $400,000 in satisfaction of a judgment against Napoli several months prior to the fire and had taken an interest-bearing mortgage in the amount of $800,000 on Napoli's property. Golden testified that, shortly after taking the mortgage, he saw someone removing valuable shrubbery from Napoli's property and that he did not want to be defrauded again. Golden explained that his previous false statements were given because of fear and embarrassment. He also did not believe that his reason for storing the gasoline at his house had any bearing on Pacific's investigation and, because he had previously thrown a small amount of gasoline on Napoli's property, he wanted to avoid possible criminal liability for vandalism. Finally, Golden alleged that he had been threatened in the past by Napoli and believed that Napoli set the fire that destroyed his house.

At the time of the loss, Citicorp Mortgage, Inc. ("Citicorp") held first and second mortgages on the premises. To facilitate compliance with the mortgagee clause of the policy, which obligated Pacific to pay to Citicorp the loss or damage regardless of "any act or neglect of the mortgagor or owner of the ... property," Golden sought from Citicorp a "pay-out" figure representing the amount needed to satisfy the two mortgages. Golden also prepared on Citicorp's behalf for submission to Pacific, separate proofs of loss and subrogation receipts covering the amount of each mortgage. The subrogation receipts entitled Pacific to assume Citicorp's rights and remedies against Golden.

Golden continued to make payments for both mortgages until February 27, 1989, when he advised Citicorp that he was discontinuing payments because Citicorp was required to submit the proofs of loss and obtain payment from Pacific for all monies due. Upon receiving the "pay-out" figures from Citicorp, Golden advised Pacific of the payment due and submitted the two proofs of loss and the two subrogation receipts on May 10, 1989. Golden's total claim consisted of $2,147,866.49 for the building loss, $253,487.45 for contents loss, and $44,400.00 for additional living expenses.

Pacific denied Golden's claim by letter dated June 30, 1989, stating that it intended to secure a judicial determination of its nonliability to Golden and that, upon such a determination, would seek to recover any payments it might make to Citicorp. Pacific denied coverage principally on the basis of its contention that the fire was intentionally set by Golden or at his behest, and because of Golden's alleged concealment and misrepresentation of material facts relating to the cause of the fire while under oath.

On July 7, 1989, Pacific tendered to Citicorp a draft in the amount of $1,710,255.99 in accordance with the proofs of loss submitted by Golden. Pacific also enclosed with its draft to Citicorp the subrogation receipts previously submitted together with a letter advising that it was required to make payment to Citicorp although it had "declined any and all liability" to Golden for the loss. Pacific returned the subrogation receipts because it believed "that the right of subrogation [did] not exist until ... a [judicial] determination of non-liability under the policy to the named mortgag[or]" had been made.

Pacific filed suit against Golden on July 13, 1989, seeking both a declaratory judgment that Pacific had no liability to Golden under the policy, and a judgment against Golden for all monies paid by Pacific to Citicorp under the policy. In its complaint, Pacific alleged, *inter alia*, that: the fire was intentionally set by Golden or at his behest; Golden concealed or misrepresented facts during the course of Pacific's investigation, in violation of the policy's provisions; Golden materially increased his

risk of loss by storing large quantities of gasoline in violation of the policy's terms; and Golden grossly inflated the damages he sustained. In his answer, Golden denied Pacific's allegations and asserted counterclaims, seeking the policy's proceeds with interest, attorney's fees, additional interest on the mortgages, additional costs and expenses and punitive damages.

On April 22, 1991, Pacific moved for summary judgment on the single ground that Golden had made a material misrepresentation rendering the insurance policy void as a matter of law. Golden then cross-moved on July 8, 1991 to strike Pacific's material misrepresentation claim. On December 31, 1991, the district court applied Connecticut law and entered summary judgment in favor of Pacific on the issue of liability, basing its decision on material misrepresentations made by Golden during the December 12, 1988 interview. The district court's decision did not address the remaining allegations in Pacific's complaint or Golden's counterclaims.

On January 10, 1992, Pacific moved to alter or amend the judgment to reflect an award for monies disbursed to Citicorp in the sum of $1,710,255.99 plus prejudgment interest at the rate of ten percent. Golden cross-moved on January 14, 1992 to vacate the judgment and enter judgment in favor of Golden on Pacific's misrepresentation claim.

The district court entered an order and amended judgment dated May 1, 1992, affirming Pacific's nonliability under the subject policy and granting Pacific judgment against Golden in the amount of $2,191,-821.78, the amount it paid on the mortgages, including prejudgment interest. Golden appeals from the judgments of the district court.

## DISCUSSION

The insurance policy issued by Pacific to Golden provided that coverage would be denied if the insured "intentionally concealed or misrepresented any material fact relating to this policy before or after a loss." Pacific contends that Golden's admittedly false statements concerning the origin and purpose of the gasoline stored in his house, made during the tape-recorded interview with Ascolese, were material to the investigation of the fire and violated the terms of the policy.

It is well established that an insurance company seeking to abrogate a fire insurance policy based upon fraudulent claims or statements of loss must show that the submissions were false, wilfully made and material to the insurer's investigation. *See* Conn.Gen.Stat. § 38a–307 (1992); *Rego v. Connecticut Ins. Placement Facility*, 219 Conn. 339, 593 A.2d 491, 495 (1991). Golden admits that the statements given during the December 12, 1988 interview were knowingly false and deliberately made, but argues that the district court erred in finding that his statements were intentional because it did not find that he intended to defraud Pacific and because he later voluntarily recanted. Golden also contends that his statements were not material to Pacific's investigation and, accordingly, that he is entitled to the proceeds of the policy.

### A. Intent

The district court properly applied Connecticut law in holding that Golden's false statements were intentionally made to Pacific. In *State Bank & Trust Co. v. Connecticut General Life Insurance Co.*, 109 Conn. 67, 145 A. 565 (1929), Connecticut's Supreme Court of Errors held that:

> Material misrepresentations ... relied on by [an insurance] company, which were untrue and known by the assured to be untrue when made, invalidate the policy without further proof of actual conscious design to defraud.... If it were necessary to prove an intent to deceive, such intent would be inferred from the making of the false representations with knowledge that they were false.

*Id.* 145 A. at 567 (citations omitted); *see also Middlesex Mut. Assurance Co. v. Walsh*, 218 Conn. 681, 590 A.2d 957, 963 (1991) (where the court, in reaffirming *State Bank & Trust Co.*, held that if material misrepresentation was knowingly

made, an automobile insurance policy is void).

Golden's statements were knowingly false and deliberately made. They were not inadvertent or the result of an honest mistake. Although Golden contends that because he did not intend to defraud Pacific, he lacked the requisite intent that would lead to cancellation of the insurance policy, this contention is without merit. *See Longobardi v. Chubb Ins. Co. of N.J.*, 121 N.J. 530, 582 A.2d 1257, 1262 (1990) (where in finding an intent to defraud an insurer, the court stated: "The insured's motive for lying ... is irrelevant. Forfeiture does not depend on proof that an insured harbored an intent to recover proceeds to which he or she was not entitled. An insurer may refuse payment if an insured wilfully misrepresented material facts after a loss, even if the insured did not harbor such an intent."). Although Golden voluntarily recanted his false statements, those statements were given wilfully in the first instance.

Golden's reliance on *United States v. Fornaro*, 894 F.2d 508 (2d Cir.1990) (per curiam), is misplaced. In *Fornaro*, a federal prosecution for perjury, we held that recantation of the perjurious statement barred prosecution where the false statement had not substantially affected the proceeding and where it had not become manifest that the falsity was or would be exposed. *Id.* at 511–12. The federal perjury statute at issue specifically provided the recantation defense and, in distinguishing *Fornaro* from this case, the district court correctly noted that "[w]hether Congress can legislate a defense from criminal prosecution and whether an insured can enforce a private insurance contract are two separate matters...." *See Golden*, 791 F.Supp. at 939. Thus, Golden's false statements to Pacific concerning the gasoline's origin and purpose were intentional misrepresentations within the intendment of the insurance policy.

### B. Materiality

■ Although Golden intentionally made false statements to Pacific, we conclude that the district court erred in finding that, as a matter of law, the statements were material to Pacific's investigation. In *Fine v. Bellefonte Underwriters Insurance Co.*, 725 F.2d 179, 183 (2d Cir.), *cert. denied*, 469 U.S. 874, 105 S.Ct. 233, 83 L.Ed.2d 162 (1984), we articulated the following standard: "the materiality requirement is satisfied if the false statement concerns a subject relevant and germane to the insurer's investigation as it was then proceeding."

In *Fine*, a fire destroyed the insured's building because the sprinkler pipes had frozen, preventing water from being pumped through them. The insurance company was investigating a theory that, based on the extremely low temperatures in the building at the time the fire started, Fine, the insured, had deliberately frozen the pipes. During his interview with the insurance company, Fine testified that the nighttime setting for the heat timer controlling the boiler was forty degrees. Fine's agent initially told the insurance company that he had instructed the building's superintendent to set the heat timer at forty degrees. In fact, Fine's agent had told the superintendent to set the heat timer for twenty-five degrees, and the superintendent had actually set it for thirty degrees. The district court did not find these false statements to be material because the sprinklers would have frozen that night even if the timer had been set to forty degrees. We reversed, finding that the temperature setting was material to the insurance company's investigation of a theory that could result in its denial of coverage. In so deciding, we held that:

> False sworn answers are material if they might have affected the attitude and action of the insurer. They are equally material if they may be said to have been calculated either to discourage, mislead or deflect the company's investigation in any area that might seem to the company, at that time, a relevant or productive area to investigate.

*Id.* at 184.

Pacific has failed thus far to show that there is no material question of fact demonstrating that its investigation would have

proceeded differently had Golden initially given his true reason for storing the gasoline at his house. The interviews conducted by Pacific following the December 12, 1988 interview of Golden merely revealed that the gasoline was not present as early as February 1988. Thus, there is insufficient evidence in the record to determine whether Golden's misrepresentations either affected Pacific's "attitude and action" or discouraged, misled or deflected its investigation, and the district court's entry of summary judgment was improper.

In holding that the materiality of Golden's statements was an issue to be decided by a jury, we find ourselves in agreement with the Fifth Circuit's decision in *Watkins v. Continental Insurance Cos.*, 690 F.2d 449, 452–53 (5th Cir.1982), in which there was a reversal of the district court's finding that a misstatement regarding an insured's whereabouts on the day his house burned down was material to the insurer's investigation of the claim. In *Watkins*, the plaintiff told the insurer that he had been at a tavern about eighty miles from his home until midnight on the day of the fire that caused plaintiff's loss. Although he neglected, allegedly through inadvertence, to tell the insurer that he had left the tavern to make a court appearance on that day at a courthouse about 100 miles from his home, the Fifth Circuit held that the significance and materiality, if any, of the omission was an issue for the jury to determine. Here too, the ultimate issue of materiality should be decided by a jury. Because we hold that the district court erred in granting Pacific summary judgment, we need not consider its award to Pacific of the payments made to Citicorp in compliance with the policy's provisions.

### CONCLUSION

The judgment of the district court granting Pacific summary judgment is reversed, and the case is remanded to the district court for further proceedings consistent with this opinion.