**Zehava HARARY, Plaintiff,**

v.

**ALLSTATE INSURANCE COMPANY, Defendant.**

Civil Action No. CV–95–0234(DGT).

United States District Court, E.D. New York.

March 13, 1997.

Ernest O. Carrozza, Peekskill, NY, for plaintiff.

Stuart D. Markowitz, Feldman and Rudy, P.C., Westbury, NY, for defendant.

## MEMORANDUM AND ORDER

TRAGER, District Judge.

■ This action arises from the defendant's denial of plaintiff's claim under her fire insurance policy for the losses suffered as the result of a fire that occurred in her house on February 22, 1993. Suit was brought under diversity jurisdiction, although a 42 U.S.C. § 1982 claim has also been alleged on the basis of plaintiff's spouse's ethnicity (Israeli).[1] Defendant is an Illinois corporation. New York State law has been applied without objection.

Plaintiff's complaint alleged seven causes of action. The first three causes of action are based on defendant's denial of the coverage provided under plaintiff's Deluxe Homeowners Policy: (1) property damage and losses consequent to a forced sale of the damaged home; (2) additional living expenses; and (3) loss of use of residence. The fourth cause of action claims consequential damages resulting from plaintiff's sale of the fire-damaged house for a price below its previous market value. The fifth cause of action arises under New York General Business Law § 349 and asserts a claim for punitive damages and legal fees in addition to the economic losses previously alleged. The sixth cause of action alleges, under 42 U.S.C. § 1982, that Allstate "engages in a pattern of denying claims to persons of Middle Eastern

and/or Israeli backgrounds without basis or justification." Compl. ¶ 33. The seventh cause of action asserts claims for negligent and/or intentional infliction of emotional distress in connection with defendant's insistence that plaintiff remain in the United States to participate in the claims evaluation process during a period in which plaintiff's mother was dying in Israel.

On October 6, 1995, defendant's motion to dismiss was granted with respect to plaintiff's fourth cause of action, her claim for consequential damages under the contract, on the authority of *Harriman v. Norfolk & Dedham Mutual Fire Ins. Co.*, 172 A.D.2d 585, 586, 568 N.Y.S.2d 820 (2d Dept.1991) (holding that consequential damages beyond the limits of an insurance policy are generally not recoverable in actions on insurance policies because they are too speculative). *See* Oral Argument 10/6/95 Tr. at 2–4. Defendant's motion to dismiss the fifth, sixth and seventh causes of action, (the claims under N.Y. Gen. Bus. L. § 349, 42 U.S.C. § 1982, and for intentional/negligent infliction of emotional distress), was denied at the same time, although discovery with regard to these causes of action was stayed. *See id.* at 10–14. Subsequently, discovery proceeded on plaintiff's first, second and third causes of action, which were based on coverage under her homeowner's policy.

Defendant has moved for summary judgment on two of its thirteen affirmative defenses: failure to cooperate and intentional concealment. Specifically, defendant first asserts that "by failing to provide [Allstate] with her 1991 and 1992 tax returns, and by repeatedly failing to provide [Allstate] with information regarding how much money she had earned in 1991 and 1992, [Harary] has breached the terms and conditions of the cooperation clause of the insurance policy."[2]

---

1. 42 U.S.C. § 1982 guarantees to all citizens the "rights enjoyed by white citizens to inherit, purchase, lease, sell, hold and convey real and personal property." Jews and Arabs (and presumably Israelis) are covered under this provision, based on the definition of race in the Reconstruction era. *See Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 617, 107 S.Ct. 2019, 2021, 95 L.Ed.2d 594 (1987); *U.S. v. Gelb*, 881 F.2d 1155,

1161 (2d Cir.1989); *Emanuel v. Barry*, 724 F.Supp. 1096, 1103 (E.D.N.Y.1989).

2. The policy at issue contains a cooperation clause in section 1 ("Conditions"):

Markowitz Aff. ¶ 6, attached to Def.'s Mot. for Summ. J. ("Def.'s Mot."). Second, Allstate asserts that it is also entitled to summary judgment because "by intentionally refusing to provide [Allstate] with information regarding how much money she earned in 1991 and 1992, plaintiff has violated the concealment or fraud provisions of [her] policy, thereby voiding [her] policy of insurance."[3] *Id.* Plaintiff replied and cross-moved for dismissal of defendant's nine affirmative defenses and for summary judgment.

## Background

The following discussion, as required on a motion for summary judgment, views the evidence and all reasonable inferences in the light most favorable to the non-movant which, for purposes of defendant's summary judgment motion, is the plaintiff.

### 1. Plaintiff's and her Husband's Financial Circumstances Prior to the Fire

Plaintiff purchased the house in 1981 with her first husband and became its sole owner after their divorce. *See* Harary Aff. ¶ 3 attached to Pltf.'s Cross–Mot. for Summ. J. ("Harary Aff."); Refinancing Appl. dated October 18, 1991, Ex. X, Def.'s Mot.[4] In 1991, Harary sought to refinance her house and did so in 1992. It was appraised at that time, although she was unable to remember the appraised value. *See* Deposition Tr. of Zehava Harary ("Harary Dep.") at 46–47, Ex. D, Def.'s Mot.

Defendant has submitted records of Harary's refinancing application and other dealings with her mortgage company, Prudential Home Mortgage, that it obtained from that company. *See* "Kadilac Mortgage Bankers Ltd. Residential Loan Application," Ex. X, Def.'s Mot. The two 1991 applications for refinancing were signed by plaintiff and (in addition to simple refinancing) included an application for an increase of $67,500 in plaintiff's total indebtedness, from $147,500 to $215,000. This request was apparently granted because the Prudential mortgage was approximately $215,000. *See* Allstate Claim Narrative at 14, Ex. B, Pltf.'s Mot. On the application forms, Harary's monthly income was listed as $10,800, the value of the house was $550,000 and the value of the business owned by Harary was $1,500,000. *See* Ex. X, Def.'s Mot. Plaintiff has not represented that these forms accurately depict her income and assets nor has she represented that she was unaware of the contents of the two applications, both of which she signed in application for a mortgage whose proceeds she does not dispute receiving.[5]

Using proceeds Ben–David received from the sale of a house in Israel, Harary and Ben–David renovated the house extensively prior to the fire. *See* Harary Aff. ¶ 4. The

---

3. What you must do after a Loss In the event of a loss to any property that may be covered by this policy, you must:

(d) Give us all accounting records, bills, invoices and other vouchers, or certified copies, which we may reasonably request to examine, and permit us to make copies.

(f) As often as we reasonably require: (1) show us the damaged property. (2) submit to examinations under oath and sign a transcript of the same.

Allstate Policy p. 18, Ex. A to Lambrianides Aff. attached to Def's Mot. for Summ. J.

3. The policy also contains a clause voiding the policy in case of fraud or concealment:

Concealment or Fraud: This policy is void if it was obtained by misrepresentation, fraud or concealment of material facts or if you intentionally conceal or misrepresent any material fact or circumstance, before or after loss. We do not cover any other insured person who has concealed or misrepresented any material fact or circumstance, before or after a loss. If it is determined that this policy is void, all premiums paid will be returned to you since there has been no coverage under this policy.

*Id.* at 6.

4. At the time of the fire Harary had been remarried to Shlomo Ben–David for five years. *See* Allstate Claim Diary at 13, 17, Ex. B, Pltf.'s Cross–Mot. for Summ. J.

5. Plaintiff notes that these documents were not in her possession during her deposition by Allstate. As discussed below, plaintiff claims that the 1991 and 1992 income tax forms provided to the defendant by Prudential Mortgage Co. "were never intended to be filed with the IRS." Harary Aff. ¶ 12. She has not, however, denied her role in completing the refinancing applications provided from the Prudential files. Her signature is on both the handwritten version dated October 18, 1991 and the typed version dated November 16, 1991. *See* Ex. X, Def.'s Mot.

refinancing application dated October 18, 1991 cites "complete renovation of bathrooms plus 2d floor refurnish, etc (see att. Pd. Bills)" as the reason for refinancing while the application dated November 16, 1991 gives "Repairs to Property" as the purpose. Ex. X, Def.'s Mot. The finished basement in which they were living at the time of the fire in February 1993 was also renovated. *See* Harary Dep. at 55, Ex. D, Def.'s Mot.

During the summer of 1992, Harary attempted to sell the house. *See* Harary Dep. at 43–51, Ex. D, Def.'s Mot. Harary reported having dealt with realtor Jon Sobel and his agent, Jackie Cohen, beginning in April 1992. The house was initially listed with an asking price of $600,000; however, it was rented in August 1992. Sobel recalled that Harary was willing to sell for $450,000, a figure he viewed as still too high. He thought it would sell for between $350,000 and $400,000. See Deposition Tr. of Jon Sobel at 10–12, Ex. E, Def.'s Mot. Harary avers that she "turned down at least three offers in the range of $350,000 because I felt the house was worth more than that." Harary Aff. ¶ 5.

Plaintiff's policy with Allstate was called a "Deluxe Homeowners Policy" with a $270,000 limit on liability. *Id.* ¶ 16. The policy submitted by Allstate includes a $280,000 limit of liability for "Dwelling Protection." *See* Allstate Declaration and Policy, Ex. 1, Gus Lambrianides Aff., Ex. AA, Def.'s Mot. Plaintiff claims, and defendant does not dispute, that the insurance limit was an underestimate of the value of the house. Defendant's investigators estimated the market value of the dwelling as $425,000 and its replacement cost as $375,000. See Allstate Claim Diary at 6, Ex. B, Pltf.'s Mot.

In August 1992, plaintiff rented the first and second floors of her house as well as part of the basement to Mr. and Mrs. Rudle, a Russian couple, for $1,800 per month, through Sobel's agency. Prior to this rental, plaintiff, her children, and Ben–David lived in the entire house. Harary explained the rental resulted from a phone call from Jackie Cohen: "[S]he said, you know 'Zehava, you know, if we can't sell or it can't happen, you can't wait, maybe we can rent. I have a very nice couple.'" Harary Dep. at 53, Ex. D,

Def.'s Mot. The Rudles paid two months' rent as security. *See id.* Simon Rudle stated that Harary told him: "She cannot afford the house and everything." Deposition Tr. Simon Rudle ("S. Rudle Dep.") at 46, Ex. F, Def.'s Mot. Plaintiff stated at her deposition that she rented the house because: "I wanted to come and go freely to Israel." Harary Dep. at 41, Ex. D, Def.'s Mot. Her mother, who lived in Israel, was ill in this period and subsequently died. *See id.* at 43. Simon Rudle also testified: "I remember very bad she wanted to move to Israel because relative, mother was ill." S. Rudle Dep. at 47, Ex. F, Def.'s Mot. Upon renting the house plaintiff and her husband moved into "one big room" in the basement, storing "a lot of clothes and personal things . . . in the attic." Harary Dep. at 54–55, Ex. D, Def.'s Mot. The children no longer lived in the house. See S. Rudle Dep. at 46, Ex. F, Def.'s Mot. The door between the Rudles' portion of the house and that occupied by plaintiff and Ben–David had no lock, and the Rudles stated that plaintiff and Ben–David repeatedly entered their apartment despite being asked not to. *See* Deposition Tr. L. Rudle, page number missing, Ex. J, Def.'s Mot. Harary noted that they used the attic for storage. *See* Harary Dep. at 55, Ex. D, Def.'s Mot.

## 2. The Fire

Plaintiff states that she and her husband had planned to go to Atlantic City on the night of the fire but canceled the plan because of snow. *See* Harary Aff. ¶ 5. Instead, plaintiff went to play cards at the home of a friend about 7:30 p.m. *See id.* Ben–David stated that he was aware that the tenants had gone abroad at least a week before the fire, and that he had "supervised" the house in their absence. See Deposition Tr. Shlomo Ben–David ("Ben–David Dep.") at 44–45, Ex. I, Def.'s Mot. Ben–David testified that he watched television that night and called to see if there was work available for him; he was a limousine driver. *See* Ben–David Dep. at 54, Ex. L, Def.'s Mot.

About 10:00 or 10:30 p.m., about an hour before he fell asleep, Ben–David heard some "dragging" noises upstairs. He stated that the noises lasted for about five minutes, and

seemed to come from an upstairs portion of the house that had a ceramic tile floor. *See id.* at 56–59. Although he knew that the tenants were abroad, he did not investigate the source of the noises. *See id.* at 58. Ben–David was awakened about 1:00 a.m. by smoke. *See id.* at 64. After he became aware of the quantity of smoke, Ben–David went to the phone and, inexplicably, attempted to call his employer to find out why he had not been called for work. *See id.* at 66, 68, 69. After finding the phone was dead, he got dressed and went outside. *See id.* at 73. He saw flames coming out of the attic and went and knocked on the door of a neighbor. *See id.* at 77–78.

As noted, when the fire occurred the tenants (the Rudles) were abroad so that only Ben–David was present. *See* Ben–David Dep. at 44–45, 58, Ex. I, Def.'s Mot. When the Rudles returned from Switzerland, they found that a number of items had been stolen from their apartment, including a new 36" television that Mr. Rudle (a world class medal-winning weight lifter in Russia) estimated would require three to four people to lift, two large, heavy bronze vases, a marble table, and two heavy chairs. *See* Deposition Tr. L. Rudle at 51, Ex. K, Def.'s Mot.; S. Rudle Dep. at 66–67, Ex. H, Def.'s Mot. The Rudles did not file a report with the police or a claim with their insurance company for these items. *See* S. Rudle Dep. at 66–67, Ex. H, Def.'s Mot. Mr. Rudle questioned the feasibility of moving these pieces of furniture during the five minute period that Ben–David reported hearing noises above him or at any time without waking Ben–David. Mr. Rudle observed that the entryway was difficult for moving furniture: "Door is terrible because it got the steps and not convenient steps. Very narrow." S. Rudle Dep. at 51, Ex. K, Def.'s Mot. He also stated:

> I don't understand was the fire if he sleep downstairs. You ask the weight of the TV. I weight lifter. I was Olympic gym in Russia, eight years national champion, silver, bronze and gold medal. It's impossible. Two men cannot lift this TV without something—you know—like the belts, spe-

> cial belts. It's terrible. I don't know how he sleep.

*Id.* at 51–52.

The New York City Fire Department Bureau of Fire Investigation filed a report on the fire listing the cause of the fire as "INCENDIARY." The report stated, in a section titled "Origin and Extension":

> Examination showed that the fire originated in the [hallway closet], on the second floor, in the East hallway closet, in combustible material: TOWELS/LINENS. The fire extended to center hallway walls, ceiling, and West closet area. The fire further extended vertically, via open flame, to the floor, walls, ceiling and contents of attic area.

City of New York Fire Department, "Fire and Incident Report," Ex. C, Def.'s Mot. Plaintiff claims, without submitting either a supporting affidavit or deposition testimony: "Following the fire, plaintiff was advised by a member of the New York City Fire Department that the fire was apparently set by a burglar." Pltf. 3(g) Statement ¶ 8. Presumably this refers to the items stolen from the Rudles and the noises heard for about five minutes by Ben–David. No criminal investigation of the alleged burglary was undertaken.

### 3. Allstate Investigation

Learning that the Fire Department found the fire was incendiary in origin, Allstate began an investigation of Harary's claim. Allstate retained an expert, Charles L. Casale of O'Neil Associates, who confirmed that the fire was incendiary in origin. See Lambrianides Aff. ¶¶ 6–7, attached to Def.'s Mot. Allstate also learned that Harary had put the house up for sale in summer 1992, and had then let it to the Rudles in September 1992, moving into what was essentially a studio apartment in the basement. *See id.* ¶¶ 8–10.

Allstate further learned that the tenants were in Europe and that Ben–David was home by himself in the basement apartment at the time of the fire. Allstate also asserts that it learned that there were no signs of forcible entry into the upstairs portion of the house, but it has presented no affidavit or testimony to support this statement. *See id.*

¶¶ 11–12.[6] It also learned that it was snowing heavily on the night of the fire. *See id.* ¶ 13. Although Harary and Ben–David made Allstate aware of their view that the fire was set in the course of a burglary, Allstate questioned this explanation on the basis of the heavy snow on that night, the absence of evidence of forcible entry, and the presence of two vehicles in the driveway of the house. *See id.* ¶ 14.

Based on the information obtained from this investigation, Allstate determined that Examinations Under Oath (EUOs) were necessary; Allstate conducted EUOs of Harary on August 16 and 26, 1993 and Ben–David on December 10, 1993. *See id.* ¶ 15. During her depositions, Harary stated that she did not file tax returns in 1991 and 1992, the two years prior to the fire, and had no copy of her 1990 return. *See* Harary Dep. at 31–33, Ex. M, Def.'s Mot. After Harary testified that she had not filed tax returns in 1991 and 1992, Allstate requested that she provide her 1990 tax return and an estimate of her 1991 and 1992 income. Harary testified that since 1993 she had been earning $180 per week. *See id.* at 31–35. Ben–David estimated that he earned between $45–55,000 in 1992, but admitted that he had been dismissed from his job for undisclosed reasons in 1993. *See* Deposition Tr. Shlomo Ben–David at 15–16, Ex. A, Pltf.'s Mot. At her subsequent EUO Harary testified that Ben–David was making $5,000 per month in 1993. *See* Harary Dep. at 34, Ex. M, Def.'s Mot. During the EUO, Allstate twice reiterated its request to Harary to provide the 1991 and 1992 income figures for Ben–David and Harary. *See* Harary Dep. at 32, Ex. M, Def.'s Mot.; Harary Dep. at 9, Ex. N, Def.'s Mot.

Allstate reiterated its request for the 1991 and 1992 income figures to Harary, in letters to her then-attorney, Barbara Matarazzo, Esq., on August 23, 1993 and on August 31, 1993, warning "that [Harary's] obligations under the terms and conditions of her policy of insurance with Allstate cannot be fulfilled unless and until she ... has provided our office with all of the information and documentation called for during her Examination Under Oath." Letter from Markowitz to Ma-

tarazzo of 8/23/93, Ex. O Def.'s Mot.; Letter from Markowitz to Matarazzo of 8/31/93, Ex. P, Def.'s Mot. Allstate extended this warning with respect to its requests at Ben–David's EUO in a letter dated December 17, 1993. *See* Letter from Markowitz to Carrozza of 12/23/93, Ex. Q, Def.'s Mot. However, as plaintiff points out, in response to a question from Allstate during his deposition, Ben–David had estimated his income for 1992 as $45–55,000. *See* Deposition Tr. Shlomo Ben–David at 15, Ex. A, Pltf.'s Mot. Ben–David does not, however, appear to have provided an estimate of his 1991 income.

Harary's attorney, Ernest Carrozza, Esq., responded to Allstate's requests in a letter dated March 2, 1994. This letter provided, inter alia, information about the renovations to the home, as well as Harary's credit card account information, and documents relating to the lease with the Rudles. *See* Letter from Carrozza to Matarazzo of 3/2/94, Ex. R, Def.'s Mot. The letter stated "to be supplied" for the following inquiries: "money earned '92 for Harary," (item 13), "money earned '91 for Harary" (item 14), and "Income in 1991 & 1992 for Mrs. Harary and Mr. Ben–David," (item 46). *Id.* The letter stated "do not have" to the following requests: "Tax returns, 1990" (item 4), "Checking account, Greenpoint Savings 2/92–2/93," (item 5), "Appraisal of house" (item 6), "Credit card statements 2/92–2/93," (item 10). *Id.* In a letter dated March 23, 1994, Allstate objected to both the form of this response and the missing material. Allstate's letter also stated that a "failure to provide all of the information and documentation called for during their /// [EUOs] would be a material breach of the terms and conditions of their policy ///". Letter from Matarazzo to Carrozza of 3/23/94, Ex. S, Def.'s Mot.

Harary replied by affidavit dated May 3, 1994, again asserting: "My income for 1992 [and 1991] will be supplied," and that "1991 and 1992 income for Mr. Ben–David is unknown to me at this time." Ex. T, Def.'s Mot. On June 13, 1994, her [then] attorney, Ernest O Carrozza, wrote:

---

6. The basis for this statement appears to be the

Allstate Claim Narrative, Ex. B, Pltf.'s Mot.

Mrs. Harary has now provided you with all requested documents in her possession and authorizations for anything she does not have, *with the exception of tax returns*. I have been advised that her accountant is working on the returns, but I do not know when he will have them completed. It is our position, however, that Allstate's decision with respect to coverage cannot be delayed indefinitely, regardless of the filing of the tax returns.

Allstate has been investigating this claim since February of 1993. If payment is not made by the end of the month, we will have no alternative but to commence litigation.

Letter from Carrozza to Matarazzo of 6/13/94, Ex. U, Def.'s Mot. ("Carrozza letter") (emphasis added).

Allstate obtained from Prudential Home Mortgage ("Prudential"), a copy of a transmittal letter dated October 7, 1993, from Harary's real estate attorney, Arthur Susnow, to Prudential that states that he is transmitting copies of her 1991 and 1992 tax returns he had obtained from Harary's accountant. *See* Ex. V; Ex. W, Def.'s Mot.[7] The date of this letter is two months after the deposition in which Harary stated she had not filed tax returns in 1991 and 1992. These returns claim adjusted gross income of $60,435 for 1992 and $120,480 for 1991. See Ex. W, Def.'s Mot.

■ Plaintiff explained the 1991 and 1992 income tax forms as having been prepared by Barbara Lustig, a mortgage consultant with Kadilac Mortgage Bankers. For several reasons, this explanation is particularly hard to credit, even when made by a non-movant on a motion for summary judgment. Plaintiff

has provided no explanation of why Lustig, who, from the materials submitted, appears to have been involved in Harary's *1991* mortgage applications (which were dated October and November 1991), would have completed *1991 and 1992* tax forms, since these returns would ordinarily be prepared in early 1992 and 1993, respectively, and the financing for this loan was already in place by the time of the fire, February 1993. Plaintiff has also offered no explanation why, if, as she asserted on January 1996, the form was prepared by Lustig, *see* Harary Dep. at 21–22, Ex. Y, Def.'s Mot.; Harary Dep. at 33, Ex. AA, Def.'s Mot., Lustig denies having done so. *See* Deposition Tr. Barbara Lustig at 30, Ex. Z, Def.'s Mot. Nor has she provided an explanation for why her accountant would have possession of them. Harary offers this explanation: "[T]hese documents were not prepared by me, they were not signed by me and they were never submitted to the Internal Revenue Service. They are not tax returns. They were never intended to be filed with the IRS." Harary Aff. ¶ 12. Essentially, her explanation comes down to this: the tax returns were part of a fraud on Prudential to obtain the refinancing, and therefore there was no reason to turn them over to Allstate. Although her explanation for how these returns came to be prepared is not entirely credible, it seems clear that these documents are not, in fact, her 1991 or 1992 tax returns.[8]

Plaintiff gave an authorization to Allstate to obtain tax returns from IRS, which, although dated August 26, 1993, is described by plaintiff's attorney as having been *"eventually* provided to defendant." Carrozza Affirm. ¶ 9, attached to Pltf.'s Mot. (emphasis added). No date is given for the delivery of

7. Plaintiff contends that defendant obtained this letter after it denied her claim on June 28, 1994. *See* Pltf.'s 3(g) ¶ 21. It is not clear from Allstate's 3(g) statement when it obtained this letter. Assuming that Harary is correct, the fact that Allstate obtained the letter after it denied the claim is not relevant since plaintiff had failed to provide any tax information prior to the denial of the claim.

8. Harary's assertion that the 1991 and 1992 income tax forms were prepared by Lustig arguably raises a dispute about a genuine issue of material fact, at least as to the issue of who prepared the returns, and, inferentially, who

would have had possession and knowledge of them. However, a non-moving party's conclusory assertions cannot defeat a motion for summary judgment, especially when, as here, plaintiff's assertions are incredible as a matter of law. *See Rickert v. Travelers Insurance Co.*, 159 A.D.2d 758, 760, 551 N.Y.S.2d 985, 987 (3d Dept.1990) (affirming lower court grant of summary judgment despite plaintiff's claim that his lack of recollection presented an issue for trial and stating: "Supreme Court could properly find that plaintiff's conclusory, self-serving averments were incredible as a matter of law.").

this authorization. However, in the Carrozza letter, which is dated June 13, 1994, Harary's attorney stated: "Mrs. Harary has now provided you with all requested documents in her possession and authorizations for anything she does not have, *with the exception of tax returns.*" Carrozza letter (emphasis added). Thus, plaintiff has not presented any evidence that the IRS authorization was provided to Allstate prior to the claim denial.

The Carrozza letter also stated: "Allstate has been investigating this claim since February of 1993. If payment is not made by the end of the month [June 1994], we will have no alternative but to commence litigation." *Id.* Allstate denied Harary's claim by letter dated June 28, 1994, sixteen months after the fire, citing the following reasons:

> intentional setting and/or procuring of the fire in question; based upon violations of those policy provisions relating to concealment or fraud; the intentional acts exclusion; based upon the increase in hazard provisions of the policy and based upon the failure to supply all of the information and documentation called for during the Examinations Under Oath.

Letter from Allstate to Harary dated June 28, 1994, Ex. A, Def.'s Mot. Reply Aff. Harary commenced suit on January 18, 1995.

### Discussion

#### 1. Summary Judgment Standard

The standard for deciding motions for summary judgment is specified in the Federal Rules of Civil Procedure:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986). "On a summary judgment motion, the court is not to weigh the evidence, or assess the credibility of witnesses, or resolve issues of fact," *Rodriguez v. City of New York,* 72 F.3d 1051, 1061 (2d Cir.1995), but, as the Supreme Court noted in *Celotex Corp. v. Catrett:* "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses," 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

Although all reasonable inferences of the non-movant are to be credited, the non-movant must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor.... The movant has the burden of showing there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict." *Anderson* 477 U.S. at 256, 106 S.Ct. at 2514. Not all disputed facts are a basis for denying summary judgment. "The non-movant may defeat summary judgment only by producing specific facts showing that there is a genuine issue of material fact for trial." *Samuels v. Mockry,* 77 F.3d 34, 35 (2d Cir.1996). Thus, a party who bears the burden of proof on an issue at trial cannot avoid summary judgment through mere assertions. *See Gottlieb v. County of Orange,* 84 F.3d 511, 518 (2d Cir.1996) (citing cases).

#### 2. Arson Investigation Standards

It is well established in New York law "that direct proof of arson is seldom available and, therefore, [arson] can be established in civil cases by circumstantial evidence," of which the financial position of the insured is often critically important. *Weed v. American Home Assurance Co.,* 91 A.D.2d 750, 751, 458 N.Y.S.2d 27, 28 (3d Dept.1982) (citing *Shawanga Holding Corp. v. New York Prop. Ins. Underwriting Ass'n,* 57 A.D.2d 677, 394 N.Y.S.2d 69 (3d Dept.1977)). *See also Elgi Holding, Inc. v. Insurance Co. of N. Am.,* 511 F.2d 957, 959 (2d Cir.1975). "[I]t is well settled that questions regarding an insured's personal finances are material and relevant to the investigation." *Ashline v. Genesee Patrons Cooperative Ins. Co.,* 224 A.D.2d 847, 638 N.Y.S.2d 217, 219 (3d Dept. 1996).

██ Defendants, at trial, have the burden of presenting "clear and convincing evidence that the fire was incendiary [e.g., not acci-

dental] in origin, and that the plaintiffs had a motive and the opportunity to commit the crime." *3910 Super K, Inc. v. Pennsylvania Lumbermens Mutual Ins. Co.*, 219 A.D.2d 589, 631 N.Y.S.2d 364, 366 (2d Dept.1995). Here, the incendiary nature of the fire is undisputed. Allstate's suspicions regarding Harary's motives were reasonably aroused by, first, Harary's having increased the indebtedness on the house (accepting that at the time it denied the claim Allstate was unaware of Harary's apparent exaggeration of her assets and income in her refinancing applications); second, her placing the house up for sale; and third, renting almost the entire house to tenants while retaining only a single basement room for herself and her spouse.

### 3. Failure to Cooperate

■ Harary's insurance policy contains a cooperation clause setting forth her duty to cooperate with Allstate. In New York, the scope of the duty a cooperation clause establishes is prescribed by statute.[9] New York courts have made it clear that this duty is a broad one: an insured's duty to cooperate "is much broader than the right of discovery under the CPLR. By its terms the insured promises to render full and prompt assistance to discover the facts surrounding the loss and anything less results in a breach of contract." *Dyno–Bite, Inc. v. Travelers Cos.*, 80 A.D.2d 471, 474, 439 N.Y.S.2d 558, 560–61 (4th Dept.1981). The insured's obligation to cooperate is not met by "partial testimony or by promises of evidence to be supplied in some indefinite future.... " *Id.* at 474, 439 N.Y.S.2d at 561.

The company is entitled to obtain, promptly and while the information is still fresh, "all knowledge, and all information as to other sources and means of knowledge, in regard to the facts, material to their rights to enable them to decide upon their obligations, and to protect them against false claims."

*Id.* (quoting *Claflin v. Commonwealth Ins. Co.*, 110 U.S. 81, 94–95, 3 S.Ct. 507, 514–515, 28 L.Ed. 76 (1884)). Further, while the affirmative defense of "willful concealment or misrepresentation of material facts" requires proof by clear and convincing evidence, failure to cooperate need be proved only by a preponderance of the evidence. *See Ashline v. Genesee Patrons Cooperative Ins. Co.*, 224 A.D.2d 847, 638 N.Y.S.2d 217, 219 (3d Dept. 1996).

A fire insurance claimant who is suspected of arson has a significant burden of cooperation. Although the plaintiff stresses the "heavy burden" on an insurer to establish non-cooperation, Pltf. Brf. at 7, the cases cited by the plaintiff almost uniformly involved third party recovery issues under insurance other than fire insurance, where the cooperation requirement is far less stringent. The basis for this distinction was explained in *Dyno–Bite:*

A distinction may be drawn, however, between a court's natural reluctance to see an accident victim deprived of his source of payment because a liability carrier claims that its assured has failed to cooperate, and an indemnity carrier denying payment to its insured because the insured has failed to cooperate in discovering a possible arson. The injured accident claimant

---

**9.** N.Y. Insur. L. § 3404(e) (McKinney 1996), which specifies the form of a fire insurance contract, provides:

> The insured, as often as may be reasonably required, .... shall submit to examinations under oath by any person named by this Company, and subscribe the same; and as often as may reasonably required, shall produce for examination all books of account, bills, invoices and other vouchers, or certified copies thereof if originals be lost, at such reasonable time and place as may be designated by this Company or its representatives, and shall permit extracts and copies thereof to be made.

The standard terms may be varied, so long as, "the policy contains, with respect to the peril of fire, terms and provisions no less favorable to the insured than those contained in the standard fire policy." § 3404(f)(1)(A).

Allstate's policy provided:

> In the event of a loss to any property that may be covered by this policy, you must: d) Give us all accounting records, bills, invoices and other vouchers, or certified copies, which we may reasonably request to examine, and permit us to make copies.

> . . . .

> f) As often as we reasonably require: ...
> 2) submit to examinations under oath and sign a transcript of the same.

is an innocent victim of the insured's failure to cooperate. A fire insured, however, controls his own fate....

*Dyno–Bite*, 80 A.D.2d at 476, 439 N.Y.S.2d 558. Thus, in *Kagan v. Taylor*, 558 F.Supp. 396, 398 (E.D.N.Y.1983), then-District Judge Joseph M. McLaughlin specifically contrasted the cooperation requirement under fire insurance policies with those under the All Risks Policy in the case before him: "A comparison of the Lloyd's All Risks Policy's cooperation clause with that of the New York standard fire insurance policy discloses that the former is far less explicit about conditions precedent to suit."

 Plaintiff's repeated refusals to answer questions about her 1990–92 income essentially resemble an assertion of her Fifth Amendment privilege against self-incrimination. It is well-settled, however, that an insured may not use her Fifth Amendment privilege as a sword against her fire insurer. *See Dyno–Bite*, 80 A.D.2d at 476, 439 N.Y.S.2d 558 ("A fire insured, however, controls his own fate and neither an individual insured nor the principals of a corporate insured may use the Fifth Amendment privilege to frustrate the fire insurers' defenses to their action."). Even if plaintiff's refusal to provide the income information was motivated by a desire to avoid disclosing a fraud on Prudential, this reason would not obviate her obligation to Allstate. As the Supreme Court stated in a similar context, "the fraud attempted upon the insurers ... is not lessened because the motive that induced it was something in addition to the possible injury to them that it might work." *Claflin*, 110 U.S. at 96–97, 3 S.Ct. at 515–516. Thus, unless Harary can show that genuine issues of material fact remain or that the tax returns were immaterial to Allstate's investigation, Allstate is entitled to summary judgment in its favor because of her otherwise unexplained failure to provide them.

### 4. Harary's Tax Returns and their Materiality

 In support of her argument that defendant is not entitled to her tax returns, plaintiff cites the New York Court of Appeals' holding in *Happy Hank Auction Co. v. American Eagle Fire Ins. Co.*, 1 N.Y.2d 534, 538–39, 154 N.Y.S.2d 870, 136 N.E.2d 842 (N.Y.1956):

> As to plaintiff's refusal to show or give defendants access to copies of plaintiff's tax returns, there not only is an arguable question as whether such production was required by the policies ... but a further question as to whether the inventory figures thereon [19 months old] would be material to the dispute as to the fire damage.

However, the dispute in *Happy Hank* concerned the value of a damaged inventory rather than arson allegations; furthermore, the inventory figure sought was for a period nineteen months prior to the loss. Here, Allstate sought information about the insured's income for the two years immediately prior to the fire; such information was obviously necessary to any assessment of the insured's financial position. None of the New York Court of Appeals' three references to *Happy Hank* since 1981 are for the proposition that insurers may not obtain the tax returns of their insureds. In fact, *Lentini Bros. Moving & Storage Co., Inc. v. New York Property Insurance Underwriting Ass'n*, 53 N.Y.2d 835, 837, 440 N.Y.S.2d 174, 175, 422 N.E.2d 819 (N.Y.1981), prefaces its citation of *Happy Hank* with a *cf.*, citing it in connection with a holding that: "[i]n view of the insured's unexcused and willful refusal to comply, there is no reason to deny summary judgment dismissing the complaint unconditionally." [10] Plaintiff also argues, under the

---

10. In *Deitsch Textiles, Inc. v. New York Property Ins. Underwriting Ass'n*, 62 N.Y.2d 999, 1002, 479 N.Y.S.2d 487, 468 N.E.2d 669 (N.Y.1984), the Appellate Division's *Happy Hank* decision (286 A.D. 505, 508, 145 N.Y.S.2d 206 (1st Dept. 1955)) was cited for the proposition that " 'the contract of insurance being entire and indivisible, a cause of avoidance or forfeiture in respect to a part of the property insured affects the whole contract.' " *Jonari Management Corp. v.*

*St. Paul Fire & Marine Ins. Co.*, 58 N.Y.2d 408, 417, 461 N.Y.S.2d 760, 764, 448 N.E.2d 427, 430 (1983) cites *Happy Hank* in connection with an issue of misrepresentation of loss.

The lone Second Circuit citation to *Happy Hank, C Suzanne Beauty Salon, Ltd. v. General Ins. Co. of Am.*, 574 F.2d 106, 110 (2d Cir.1978), was an affirmance of a district court's denial of summary judgment to the insurer under the co-

principles that an insurance contract is construed against the insurer who drafted it and that the law disfavors forfeiture, that because the terms of the policy do not specify "income" or "income tax returns," the cooperation clause should not be enforced against her. This argument was specifically rejected by the Second Department in *2423 Mermaid Realty Corp. v. New York Prop. Ins. Underwriting Ass'n*, 142 A.D.2d 124, 534 N.Y.S.2d 999, 1003 (2d Dept.1988). There, the court held that the income tax returns of the principals of a corporation as well as those of the insured corporation were "relevant and material to any insurance company investigating a fire loss claim." *Id.* at 131, 534 N.Y.S.2d 999. The court also noted that "In view of the fact that direct proof of arson is seldom available . . . . [i]nformation gleaned from the tax returns of an individual insured or the officers of a corporate insured can be of crucial significance. . . ." *Id.* at 130, 534 N.Y.S.2d 999 (citing *Elgi Holding, Inc. v. Insurance Co. of North Am.*, 511 F.2d 957, 959 (2d Cir.1975)). The *2423 Mermaid* court also cited *Averbuch v. Home Ins. Co.*, 114 A.D.2d 827, 494 N.Y.S.2d 738 (Dept.1985), and *Ausch v. St. Paul Fire & Marine Ins. Co.*, 125 A.D.2d 43, 511 N.Y.S.2d 919 (2d Dept.1987), for the principle that failure to provide personal tax returns breaches a substantial condition of the policy.

Here plaintiff has represented, once by her attorney's letter and once in her own affidavit, that she would provide information about her income in 1991 and 1992, but has made no representations concerning any effort to do so. She now claims that she cannot recall her income for those years. Although plaintiff has stated several times that she would provide information about her 1991 and 1992 income, in her 1996 deposition she states only

that she has not "had a chance" to compile an estimate of the amount of money she earned in 1991 and 1992, despite the fact that two and one half years had elapsed since she was first asked for the information at her August 1993 EUO. *See* Harary Dep. at 32, Ex. AA, Def.'s Mot. In 1996, after refusing to provide the information at her deposition, even though ordered by the court to respond, Harary has stated that: "It was, and is, impossible for me to recall the amount of my income for [1991 and 1992]." Harary Aff. ¶ 8. Nor has she presented any evidence demonstrating an effort to compile the information. Finally, as previously noted, she has disavowed the tax forms Allstate obtained from Prudential, asserting that she neither prepared nor signed them. *See* Harary Dep. at 33, Ex. AA, Def.'s Mot. Thus, rather than provide the requested information, plaintiff has provided only "conclusory, self-serving averments" that are "incredible as a matter of law." *Rickert v. Travelers Ins. Co.*, 159 A.D.2d 758, 760, 551 N.Y.S.2d 985, 987 (3d Dept.1990) (affirming lower court grant of summary judgment despite plaintiff's claim that his lack of recollection presented an issue for trial, the court stated: "Supreme Court could properly find that plaintiff's conclusory, self-serving averments were incredible as a matter of law.").

### 5. Issues of Fact Regarding Harary's Failure to Cooperate

Plaintiff contends that even if the court finds that there is evidence that she failed to cooperate, issues of fact exist with regard to her cooperation that must be presented for trial. Such a contention has been rejected by the Second Circuit: "[T]he New York Court of Appeals has held, 'without indicating approval' of *Pogo*,[11] that 'in view of the

---

operation clause. In *C Suzanne* the insurance company acceded to the insured's declining to appear at an examination under oath, never scheduled another, and failed to warn the insured of the consequences of voiding the policy. However, the circuit has since noted that this holding may have been called into question, even on its own, rather extreme facts. In *Rosenthal v. Prudential Property & Cas. Co.*, 928 F.2d 493, 495 (2d Cir.1991), the court noted that the New York Court of Appeals' affirmances of dismissals of actions against insurers "suggest that a finding of willfulness extinguishes any 'right' to a 'last op-

portunity.' " Thus, to the extent that plaintiff might be entitled to a "last opportunity," her willful non-cooperation has extinguished that opportunity.

11. Referring to *Pogo Holding Corp. v. New York Property Ins. Underwriting Ass'n*, 73 A.D.2d 605, 422 N.Y.S.2d 123 (2d Dept.1979), in which it was held "that New York law allows a recalcitrant insured a 'last opportunity' to cooperate. . . ." *Rosenthal* at 495. In *Rosenthal*, the court held that the plaintiff had had a last opportunity to cooperate when the district court denied the in-

insured's unexcused and willful refusal to comply, there is no reason to deny summary judgment dismissing the complaint unconditionally.' ... We intend to follow this direction from New York's highest court." *Rosenthal v. Prudential Property & Casualty Co.*, 928 F.2d 493, 495 (2d Cir.1991).

Plaintiff contests the materiality of her failure to provide the requested information, asserting that "[p]laintiff's inability to recall the amount of her income in 1991 did not in any way discourage, mislead or deflect the defendant's investigation." Pltf. Brf. at 19. Plaintiff places great emphasis on a recent Second Circuit case, *Pacific Indemnity Co. v. Golden*, 985 F.2d 51 (2d Cir.1993). This case, however, was based on Connecticut, not New York, law, and concerned a claim that the policy was voided by misrepresentation, not by failure of cooperation. There, also, the insured corrected the misrepresentation he made at an unsworn interview during his examination under oath. Harary has never provided any estimate of her 1991 and 1992 income or even any representations of any good faith effort to comply with her May 3, 1994 affidavit that this information "will be supplied." Furthermore, plaintiff's reliance on this case is misplaced, because determining whether a false statement is material cannot be equated with determining if a failure to cooperate has occurred. In the former, the question is whether the insurer would have acted differently, given the correct information. *See Pacific Indem.*, 985 F.2d at 56 (" 'False sworn answers are material if they might have affected the attitude and action of the insurer.' ") (quoting *Fine v. Bellefonte Underwriters Ins. Co.*, 725 F.2d 179, 184 (2d Cir.1984)). In contrast, a finding of a failure to cooperate on a material issue means that with regard to that issue the insured has failed to provide *any* information on that material issue. Even assuming, however, that a materiality analysis is proper, plaintiff's arguments are unavailing.

▆ Plaintiff argues that her 1991 and 1992 income were not "material" to Allstate's

investigation, that she provided many documents and answered many questions but only refused to answer two. *See* Pltf. Brf. at 11. Further, plaintiff asserts that the information was not material to Allstate's determination to deny the claim: "Once Allstate had discovered that the fire was classified as incendiary, that Mr. Ben–David was at home at the time of the fire and that Mrs. Harary had attempted to sell the house in the months [before] the fire, nothing she said about her income was going to alter their evaluation of the claim." *Id.* at 12. This remarkable argument, if extended, would deny an insurer any right to cooperation from the insured where arson was reasonably suspected. This, in turn, would virtually guarantee that an insurer would be unable to deny coverage in any suspected arson where the level of proof was below that necessary to obtain a criminal conviction. Plaintiff's argument would render New York's statutory cooperation clause, as found in standard fire insurance policies, a nullity.

Furthermore, plaintiff's argument was rejected in *232 Broadway Corp. v. New York Prop. Ins. Underwriting Ass'n*, 206 A.D.2d 419, 421, 615 N.Y.S.2d 42, 43 (2d Dept.1994). In this case, the plaintiff had failed to provide requested items and had also provided conflicting loss information. The court found that

[Plaintiff] has had numerous opportunities to cure any deficiencies and has failed to do so. In any event, the alleged inability of [plaintiff] to previously recall the vast majority of the claims he now sets forth in his affidavit ... renders his testimony at the ... examinations under oath incredible as a matter of law. We therefore find that, as a matter of law, [plaintiff] has failed to cooperate with its insurers as required under its insurance policies. Such failure is a material breach of those policies. Its actions under those policies must therefore be dismissed.

*Id.* at 421, 615 N.Y.S.2d 42 (citations omitted). The court also held that "it was an

surer's motion on the condition that plaintiff submit to an EUO. *See Rosenthal*, 928 F.2d at 495. As in *Rosenthal*, Harary has been allowed a last opportunity when, during a telephone con-

ference, the court directed her to produce her 1991 and forward tax returns. *See* Calendar of 1/4/96, docketed as document number 14.

abuse of discretion to permit [plaintiff] this one last opportunity to provide the requested items," *id.,* thus rejecting the dissenting judge's position that the facts of the case could not support a finding of "a willful pattern of noncooperation." *Id.* at 422, 615 N.Y.S.2d 42 (Balletta, P.J., dissenting).

Materiality is also not determined by the *ultimate* importance of the information to the insurer but rather its relevance to the investigation at the time asked. In *Fine v. Bellefonte Underwriters Ins. Co.,* 725 F.2d 179, 183 (2d Cir.1984), the court held:

> The law is clear that the materiality of false statements during an insurance company investigation is not to be judged by what the facts later turn out to have been. . . . [T]he materiality requirement is satisfied if the false statement concerns a subject relevant and germane to the insurer's investigation as it was then proceeding.

Thus the materiality of Allstate's inquiry regarding Harary's 1991 and 1992 income must be evaluated in August 1993, when it was first made, and before Harary's attorney had even forwarded the 1991 and 1992 tax forms prepared by her accountant to Prudential. No reasonable jury could find that a failure to provide any of this information was not material at this point in time.

Further, plaintiff's statement that "Mrs. Harary has been given no second or third chance to provide the requested information," Pltf. Br. at 10, is extraordinary, given the extensive correspondence between defendant and plaintiff's counsel warning of the consequences of her failure to provide the information. It can only be based on the narrow ground that she, for the first time, at her deposition in 1996 stated that she could not *recall* her 1991 and 1992 income. She had agreed at her Examinations Under Oath in August 1993 that she would complete the blanks left for her 1991 and 1992 income and, subsequently, submitted an affidavit that she would "supply" her 1991 and 1992 income. Even if it were true that Mrs. Harary had

been given only one chance to supply the information, that chance came at a time that the court ordered her to provide the information—and she failed to do so.[12]

■ As noted above, recent case law is clear that it is an error of law to require an insurer to provide the insured one more chance to provide material information when the insured's prior conduct demonstrates a willful failure to comply. The Court of Appeals for the Second Circuit, affirming a dismissal of suit against insurer for fire loss where arson was suspected, stated in *Rosenthal v. Prudential Property & Cas. Co.,* 928 F.2d 493, 495 (2d Cir.1991): "We note . . . that New York courts have recently retreated from affording an insured a 'last opportunity' when the insured's refusal to cooperate is willful." The *Rosenthal* court had previously noted "When the insured's failure to fulfill his obligations under an insurance policy 'is indicative of a pattern of non-co-operation [sic] for which no reasonable excuse for noncompliance has been proffered,' . . . his conduct is properly deemed willful." *Id.* at 494 (quoting *Bulzomi v. New York Cent. Mut. Fire Ins. Co.,* 92 A.D.2d 878, 459 N.Y.S.2d 861 (2d Dept.1983)).

■ Here, Harary's willful violation of the cooperation clause in her fire insurance policy with respect to facts materially relevant to Allstate's investigation of her claim has been established by far more than a preponderance of the evidence. Plaintiff does not, and indeed cannot, dispute that she has failed to provide Allstate with her 1991 and 1992 income, evidence of her financial status that is materially relevant to her fire loss claim on the incendiary destruction of her home. Plaintiff has failed to raise any material issue of fact on this defense that would warrant trial. Defendant's motion is therefore granted as to that portion of the motion seeking summary judgment on the ground that Harary failed to cooperate, thus breaching her policy. Thus, summary judgment is granted to defendant on plaintiff's first three causes of action.[13]

---

12. During a telephone conference held on January 4, 1996, plaintiff was ordered to produce tax returns from 1991 forward. *See* Calendar of 1/4/96, docketed as document number 14.

13. Defendant also moved for summary judgment on the ground of intentional concealment/misrepresentation. In New York, while non-cooperation may be proved by a preponderance of the

### 6. Plaintiff's Remaining Claims

At oral argument on a prior motion to dismiss, discovery was stayed on plaintiff's claims based on 42 U.S.C. § 1982, § 349 of New York's General Business Law, and the emotional distress claims, pending the disposition of the claims regarding the policy. At that time, although Allstate's motion to dismiss was denied, plaintiff was directed to move to amend her complaint to provide specific allegations in support of her additional claims, if she wished to pursue those claims; plaintiff's counsel indicated that he would move to amend the complaint. See Oral Argument 10/6/95 Tr. at 10–14. To date, plaintiff has not filed a motion to amend. Plaintiff may move to amend her complaint regarding the fifth, sixth, and seventh causes of action within thirty days from the date of the entry of the order granting summary judgment in defendant's favor on plaintiff's first three causes of action. If plaintiff does file an amended complaint, plaintiff shall file at the same time a letter explaining why the disposition of the first three causes of action would not preclude her from recovering under all of the remaining claims. If plaintiff chooses not to file a motion to amend, the court will treat plaintiff's remaining claims under a summary judgment standard. Summary judgment will be considered on the basis that because the first three causes of action were dismissed on the ground that plaintiff failed to cooperate, plaintiff now lacks standing to bring the remaining causes of action. Plaintiff may, therefore, either move to amend her complaint, or alternatively, to contest summary judgment.

### Conclusion

The court grants the defendant's motion for summary judgment on plaintiff's first three causes of action, on the ground that plaintiff has failed to cooperate. Plaintiff's cross-motion for summary judgment is denied. Plaintiff may move to amend her com-

plaint relating to the fifth, sixth, and seventh causes of action within thirty days of the date of this order. If plaintiff does not move to amend the remaining causes of action in the complaint within that time, the court will grant summary judgment to defendant on plaintiff's remaining causes of action on the ground that plaintiff has sustained no injury; thus, in lieu of moving to amend, plaintiff may elect to contest summary judgment. Such motion contesting summary judgment on this ground must also be made within thirty days of the date of this order.

---

evidence, a defendant must meet a higher standard of proof, that of clear and convincing evidence, in order to void a policy on the basis of intentional concealment or misrepresentation. *See Ashline v. Genesee Patrons Co-op. Ins. Co.,* 224 A.D.2d 847, 638 N.Y.S.2d 217, 219 (3d Dept. 1996). Although the facts that support granting

summary judgment on the ground that Harary violated the cooperation agreement lend support to summary judgment on this claim, it is not necessary to reach this issue in light of the judgment in Allstate's favor on the non-cooperation ground.