DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**ANCHOR PROPERTY AND CASUALTY INSURANCE COMPANY,**
Appellant,

v.

**ALEX TRIF** and **GEORGE TRIF,**
Appellees.

No. 4D20-814

[June 2, 2021]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; G. Joseph Curley, Jr., Judge; L.T. Case No. 50-2018-CA-00820-XXXX-MB.

Patrick M. Chidnese and Jessica S. Kramer of Holland & Knight LLP, Tampa, and Hope C. Zelinger and Krista L. Elsasser of Bressler, Amery & Ross, P.C., Miami, for appellant.

Percy Martinez of Percy Martinez, P.A., Coral Gables, for appellees.

GROSS, J.

Anchor Property and Casualty Company appeals a final judgment in favor of its insureds, George Trif and his son, Alex Trif. We affirm. Viewing the trial evidence in the light most favorable to appellees, we conclude that a reasonable view of the evidence supports the jury's verdict awarding some damages in a breach of contract lawsuit.

### The Loss and the Policy

On September 10, 2017, the Trifs' home, which was insured by Anchor, was damaged by Hurricane Irma. The policy contains the following provision regarding "Concealment or Fraud":

**2. Concealment or Fraud.**

a. Under SECTION I - PROPERTY COVERAGES, with respect to all "insureds" covered under this policy, we provide no

coverage for loss under SECTION I - PROPERTY COVERAGES if, whether before or after a loss, one or more "insureds" have:

(1) Intentionally concealed or misrepresented any material fact or circumstance;
(2) Engaged in fraudulent conduct; or
(3) Made material false statements;

relating to this insurance.

### *Inspection and Denial of Payment Letter*

Anchor sent a field adjuster to inspect the home on September 30, 2017.

On December 2, 2017, Anchor wrote the insureds stating that it had completed its investigation of the claim. The letter stated that no payment would be made because Anchor's estimate of the insureds' loss was $2,462.40, less than the policy's deductible. The letter further indicated that Anchor would not cover the interior water damage because there was no peril-created opening, and the adjuster's inspection "found no physical evidence of any wind damaged shingles." Attached to the letter was an estimate noting that "[n]o covered storm damage noted to any slopes of roof during inspection."

However, the letter said that the insureds "may submit a supplemental claim to us for consideration by providing any additional information about the damage and the associated repair costs."

### *The Original Exactimators Estimate*

On December 6, 2017, Nicholas Merced, the owner of a company called Exactimators, created an estimate of all the damages to the home. The estimate set forth a "net claim" of $103,809.68, which included an entry of $52,800 for "Roofing (Bid Item)" and an entry of $5,890.26 for replacing the screened pool enclosure.

### *The Sworn Proof of Loss*

On December 11, 2017, Alex Trif signed a Sworn Proof of Loss stating that the "whole loss and damage" was $103,809.68. The information in the Sworn Proof of Loss was typed, with only the signature lines and the notary information filled in by hand. The insureds submitted the Sworn Proof of Loss, along with Merced's estimate, to Anchor. Merced's estimate

was not referenced on the Sworn Proof of Loss, but Alex conceded that the figure on the Sworn Proof of Loss was based on the estimate.

Anchor presented no evidence at trial that it took any action in response to the estimate or the Sworn Proof of Loss.

### *The Pleadings*

On January 20, 2018, the insureds sued Anchor for breach of contract, alleging that Anchor breached the policy by refusing to pay the full amount of the claim. The insureds further alleged that, through their public adjuster, they forwarded Anchor an estimate of the damages. Merced's estimate was attached to the complaint as the estimate that the insureds provided to Anchor.

Anchor filed an answer and affirmative defenses. Anchor's defenses included allegations that there was no peril-created opening and that certain damages were caused by wear and tear.

Anchor later amended its answer to assert as an affirmative defense that Anchor was relieved of its indemnity obligation under the "Concealment or Fraud" provision due to the insureds' "intentional misrepresentation and/or fraudulent conduct and/or material false statements." Specifically, Anchor alleged that the insureds made willful misrepresentations and material false statements regarding the pre-loss condition of the property, as the insureds had "denied that any pre-loss roof leaks had occurred," when in fact a 2012 insurance claim investigation revealed roof leaks. Anchor further alleged that the insureds made willful misrepresentations and material false statements regarding the "extent and/or amount of damage" at issue, namely, the extent of damage to the flooring.

Anchor did not specifically allege that the insureds made an intentional misrepresentation or a material false statement regarding the cost to replace the roof.

Prior to trial, the trial court entered an agreed order granting Anchor's motion for partial summary judgment eliminating the insureds' claim for damages to the pool screen enclosure because it was not covered under the policy.

***The Jury Trial—Facts Regarding the "Concealment or Fraud" Issue***

The case proceeded to trial, where the following evidence and argument was presented on whether coverage was barred under the "Concealment or Fraud" clause.

<u>Anchor's Opening Statement</u>

In opening statement, Anchor's counsel stated that "there is no coverage if you make a false statement," and that the insureds made "blatant misrepresentations." However, counsel did not specifically assert that the Sworn Proof of Loss was a material false statement because it was based on an inflated estimate to repair the roof.

<u>George Trif's Testimony</u>

George Trif testified that water began pouring from the ceiling on the night Hurricane Irma struck. He described the damage to the home from the hurricane. George also addressed the 2012 insurance claim for water damage.

The morning after Hurricane Irma passed, a handyman referred George to Jean Guirand, who performed temporary patch work on the roof for $700 or $800. Guirand later provided him with two estimates: one to "fix" the roof for about $6,000 and one to replace the roof for "20 something thousand." The second estimate, which is dated November 10, 2017, appears to be in the amount of $25,450. However, this estimate did not include the cost to replace all the wood.

George described various repairs that he made out-of-pocket because Anchor failed to pay for them. These repairs included repairs to rid the home of mold and mildew.

On cross-examination, Anchor's counsel asked George about the Exactimators' estimate. He responded that he remembered "a gentleman being in the house, measuring everything." George admitted that he "look[ed]" at the estimate, and that he did so because it was part of his claim against Anchor.

George said that the $52,800 estimate for replacing the roof was submitted to Anchor on his behalf, but he claimed that the estimate was made by a professional:

4

Q. Even if it was 30, why did you ask Anchor to give you $52,800?

A. Because that is not me. That's the estimate. That is a contractor. That's a specialist. That's a contractor. Don't ask me that.

* * *

Q. So you're admitting – you will just admit that you asked Anchor to pay you $52,800 through this Exactimators' estimate, correct?

A. No. That is not an estimate by me. It is an estimate by a professional.

George also claimed that he had been given different estimates of the cost to replace the roof: "Even to – to your adjuster, I gave a few of them, because I get different estimates." George received a proposal from Guirand for $26,000 and said that Guirand would charge "a minimum" of $32,000 today because his proposal did not include replacing all the wood. George acknowledged that $32,000 was "a lot less" than $52,000.

On redirect, George reiterated that he had nothing to do with producing or creating the Exactimators' estimates. George did not know how to work the Xactimate software used to create these estimates. When asked if the man from Exactimators asked him if he was in agreement with every single line item on the estimate, George replied: "No, he never asked me if I'm in agreement with it or not, never."

Guirand's Testimony

Guirand testified that he quoted George a price of $26,000 to replace the roof after the storm, but that the price would be $32,000 at the time of trial.

Merced's Testimony

Merced testified that the insureds' public adjuster paid him $250 to go to the insureds' home to prepare an estimate of the damage from Hurricane Irma. Merced used a software program called Xactimate, which automatically creates line item entries specific to particular zip codes.

5

At the time he inspected the insureds' home, Merced was working 16-hour days, seeing five-to-ten homes per day. Merced did not personally know the insureds and had not been back to their house since the day of the inspection.

Merced prepared two estimates: (1) the original estimate in December 2017; and (2) an estimate in 2019 before his deposition. The first estimate was superseded by the second.

In the first estimate, Merced admitted that he changed a price on the line item for roofing "from what Xactimate gave [him] to his own pricing or a bid item from a contractor." The price of the roof in the first estimate was "around $52,000."

In the second estimate, the roof estimate was lowered from $52,800 to $28,000. Merced explained that the bid item was "too high" for the roof. Merced elaborated as to how this change occurred:

> Well, . . . I talked to the Church Hill public adjuster. We came to an agreement that the roof was too high. So we decided to go back and assess and kind of like brainstorm over the roof and adjust accordingly.

However, even with the reduction for the roof, the second damages estimate went up by about $20,000 to $123,855.48, as the original estimate failed to include the damage to the kitchen.

Merced provided the original estimate to the public adjuster. Merced did not give this estimate to the insureds. Merced explained that he does not "do that with clients."

Merced also testified that he was doing "over 150 estimates" at the time he prepared the insureds' first estimate. He admitted that he makes mistakes and oversights on estimates.

On cross-examination, Merced admitted to various oversights in his original estimate, explaining that he was trying to get to other appointments that day. He did not take any photographs of the roof or keep any notes from his visit to the insureds' home.

When questioned about the $52,800 roofing estimate, Merced initially denied that he got this item from George. He acknowledged that the estimate was "extensively high." Merced was impeached by his prior deposition testimony where he said that he had gotten the $52,800 "from

6

George Trif, if I'm not mistaken." He conceded that he knew the estimate would be given to Anchor Insurance with a Sworn Proof of Loss and that the estimate was inaccurate and inflated.

### Alex Trif's Testimony

Alex Trif testified that he allowed his father to handle the claim to Anchor. He said that 2012 damages were repaired before the 2017 hurricane hit. He said that he submitted a Sworn Proof of Loss in the amount of $103,809.68 and explained that he had been "professionally advised" to do so.

### Motion for Directed Verdict

Following the close of the insureds' case, Anchor rested without presenting any evidence. Anchor then moved for a directed verdict, arguing that coverage was voided under the policy because the insureds provided a Sworn Proof of Loss that was based on an inflated estimate to repair the roof. The Trifs' counsel raised no objection as to Anchor's failure to plead the defense that coverage was voided due to an inflated roof estimate. Instead, he argued that fraudulent conduct and materiality were questions for the jury. The trial court reserved ruling on the motion.

### Closing Arguments

In closing argument, the Trifs' counsel argued that there was no evidence "the $52,000 roof [estimate] was an intentional misrepresentation."

Anchor's counsel emphasized that the Trifs made a materially false statement when they submitted a Sworn Proof of Loss claiming $52,800 for the roof. According to Anchor's counsel, George knew this figure was inaccurate, because he "had a proposal to do the roof for half that amount."

## *The Jury's Verdict*

The jury returned a verdict finding that: (1) Anchor failed to satisfy its obligations under the policy; (2) the insureds did not intentionally conceal or misrepresent any material fact, engage in fraudulent conduct, or make a material false statement; (3) the insureds did not fail to comply with policy conditions so as to prejudice Anchor's investigation of the claim; and (4) the insureds sustained damages of $26,425.

### *Post-Trial Motions and Final Judgment*

As to the issue of the roof estimate, Anchor filed post-trial motions seeking a judgment notwithstanding the verdict or, in the alternative, a new trial. Anchor argued that it was entitled to a directed verdict because the insureds made a material false statement to Anchor by submitting a Sworn Proof of Loss based on an inflated estimate for replacement of the roof. In a detailed order, the trial court denied the motion for JNOV, reasoning that there was conflicting evidence on the issues of intent and materiality. The court entered a final judgment consistent with the jury's verdict.

### *The Trial Court Properly Denied Anchor's Motion for Directed Verdict Because a Reasonable View of the Evidence is That They Did Not Violate the "Concealment or Fraud" Provision of the Policy*

Anchor argues that it is entitled to a directed verdict because the insureds' Sworn Proof of Loss contains a material misrepresentation—the claim of $52,800 to repair the roof. The insureds respond that Anchor waived this defense by failing to plead it with specificity and that the trial evidence, in the light most favorable to them, supports the jury's verdict.

"An order on a motion for directed verdict or for judgment notwithstanding the verdict is reviewed de novo." *Kopel v. Kopel*, 229 So. 3d 812, 819 (Fla. 2017). The evidence and all inferences of fact must be viewed "in the light most favorable to the nonmoving party." *Id.* Thus, "an appellate court must affirm the denial of a motion for directed verdict if any reasonable view of the evidence could sustain a verdict in favor of the non-moving party." *Meruelo v. Mark Andrew of Palm Beaches, Ltd.*, 12 So. 3d 247, 250 (Fla. 4th DCA 2009).

<u>The Parties Tried by Consent the Issue of Whether the Insureds Violated the "Concealment or Fraud" Provision by Submitting a Sworn Proof of Loss Based on the First Roofing Estimate</u>

Anchor failed to plead with specificity that the insureds violated the "Concealment or Fraud" provision of the policy by submitting a Sworn Proof of Loss based on a material misrepresentation concerning the cost to replace the roof. *See Cocoves v. Campbell*, 819 So. 2d 910, 912 (Fla. 4th DCA 2002) (stating that "[w]hen a party asserts fraud as a defense, the pertinent facts and circumstances constituting fraud must be pled with

8

specificity, and all the essential elements of fraudulent conduct must be stated").

Nonetheless, the issue was tried by consent.

"An issue is tried by consent when there is no objection to the introduction of evidence on that issue." *LRX, Inc. v. Horizon Assocs. Joint Venture ex rel. Horizon–ANF, Inc.*, 842 So. 2d 881, 887 (Fla. 4th DCA 2003). For example, an issue is tried by consent where a party "never objected to the evidence or argument" regarding the issue "on grounds that the issue was not framed in the pleadings." *Citigroup Mortg. Loan Tr. Inc. v. Scialabba*, 238 So. 3d 317, 324 (Fla. 4th DCA 2018).

Still, "[a] failure to object cannot be construed as implicit consent to try an unpled theory when the evidence introduced is relevant to other issues properly being tried." *Raimi v. Furlong*, 702 So. 2d 1273, 1285 (Fla. 3d DCA 1997). Two interrelated criteria for determining whether an issue was tried by consent are "(a) whether the opposing party had a fair opportunity to defend against the issue and (b) whether the opposing party could have offered additional evidence on that issue if it had been pleaded." *Fed. Home Loan Mortg. Corp. v. Beekman*, 174 So. 3d 472, 475 (Fla. 4th DCA 2015).

Here, the issue of whether the Sworn Proof of Loss violated the "Concealment or Fraud" provision consumed a significant portion of the trial. During the trial, the parties presented extensive evidence and argument on this issue without any objection from the insureds that the issue exceeded the scope of the pleadings. The insureds suggest that no objection was necessary because the testimony was relevant to the issue of damages. But Anchor's cross-examinations of the Trifs and Merced went well beyond any relevance to damages.

Instead, Anchor asked numerous questions that were designed to elicit testimony as to whether the $52,800 roofing estimate was knowingly inflated. This theory of defense took center stage well before Anchor moved for a directed verdict on the issue. The insureds had a fair opportunity to combat Anchor's claims of fraud. They did not call an expert witness on their witness list who had testified that $52,800 was not too high an estimate to replace the roof. They argued the merits of the fraud issue to the jury. They did not object that the issue was unpled until after the jury had considered the issue and reached a verdict. Because the issue was tried by consent, we now turn to the merits.

9

<u>The "Concealment or Fraud" Provision in the Policy Requires Proof
that the Insureds Acted Knowingly or Intentionally In Order to Void
the Policy</u>

Applying well-established principles of construction, we conclude that
the "Concealment or Fraud" provision is ambiguous, so it must be
construed in the light most favorable to the insureds. With this in mind,
we hold that, for post-loss conduct, the policy requires proof of knowing or
intentional fraudulent conduct by the insureds to trigger the application
of the "Concealment or Fraud" provision to void the policy.

The law abhors forfeiture of insurance coverage. *Am. Integrity Ins. Co.
v. Estrada*, 276 So. 3d 905, 914 (Fla. 3d DCA 2019). "Policy provisions
that tend to limit or avoid liability are interpreted liberally in favor of the
insured and strictly against the drafter who prepared the policy." *Flores
v. Allstate Ins. Co.*, 819 So. 2d 740, 744 (Fla. 2002). Moreover, "forfeiture
of rights under an insurance policy is not favored by the law, especially
where, as here, a forfeiture is sought after the happening of the event giving
rise to the insurer's liability." *Johnson v. Life Ins. Co. of Ga.*, 52 So. 2d
813, 815 (Fla. 1951); *see also Boca Raton Cmty. Hosp., Inc v. Brucker*, 695
So. 2d 911, 912 (Fla. 4th DCA 1997).

Still, a policy provision that voids coverage for fraud or concealment
relating to the insurance is fully enforceable in Florida. *See Svetlanovich
v. State Farm Fla. Ins. Co.*, 291 So. 3d 1261, 1265 (Fla. 2d DCA 2020)
(explaining that a policy provision voiding coverage "if the [insureds] made
any material misrepresentations or concealed any material facts either
before or after a loss" was "fully enforceable"); *Alvarez v. State Farm Fla.
Ins. Co.*, 305 So. 3d 5, 8 (Fla. 3d DCA 2019) ("As a matter of law, the finding
of material misrepresentation voids coverage for the claim."); *Lopes v.
Allstate Indem. Co.*, 873 So. 2d 344, 346 (Fla. 3d DCA 2004) ("[T]he subject
policy contained a provision whereby Allstate stated it would not provide
coverage for any loss which occurred in connection with any material
misrepresentation, fraud or concealment of material facts. This policy
provision is fully enforceable in Florida.") (footnote omitted); *Wong Ken v.
State Farm Fire & Cas. Co.*, 685 So. 2d 1002, 1003 (Fla. 3d DCA 1997)
("There is no question that the clause which voids coverage if the insured
makes an intentional misrepresentation 'after a loss'—that is, as here, in
making a claim—is valid and enforceable.").

It is "well settled that, for there to be a total forfeiture of coverage under
a homeowner's insurance policy for failure to comply with post-loss
obligations (i.e., conditions precedent to suit), the insured's breach must
be *material*." *Estrada*, 276 So. 3d at 914. (italics in original). "A

misrepresentation is material if a reasonable insurance company, in determining its course of action, would attach importance to the fact misrepresented." *In re Sandell*, No. 8:00BL6417KRM, 2005 WL 1429746, at *2 (Bankr. M.D. Fla. June 9, 2005). In other words, a statement is material if it is "reasonably relevant to the insurance company's investigation of a claim." *Dadurian v. Underwriters At Lloyd's, London*, 787 F.2d 756, 760 (1st Cir. 1986).

"[W]hen the insurer is acting to enforce a contract provision that voids coverage based on willful postloss misrepresentations concerning material facts, the insurer need not demonstrate either reliance or prejudice." *Svetlanovich*, 291 So. 3d at 1265. Stated another way, a willful misrepresentation can be material under the policy without inducing actual reliance. Still, the concepts of materiality and reliance are intertwined because the materiality of a misrepresentation turns on its likelihood of inducing reliance in a reasonable person. *See Restatement (First) of Restitution* § 8 (1937) ("(2) A misrepresentation is material if it would be likely to affect the conduct of a reasonable man with reference to the transaction in question.").

The materiality of a misrepresentation is a question for the jury. *Haiman v. Fed. Ins. Co.*, 798 So. 2d 811, 811 (Fla. 4th DCA 2001) ("[M]ateriality is a question of fact to be determined by the trier of fact."); *Lopes*, 873 So. 2d at 347 ("The question of whether an insured has made a material misrepresentation is a question for the jury to determine.").

An insured can make a material misrepresentation "by exaggerating the extent of the loss."[1] *Alvarez*, 305 So. 3d at 7–8. A policy may be voided for post loss "material misrepresentations of substantive amounts." *Collins v. USAA Prop. & Cas. Ins. Co.*, 580 N.W.2d 55, 57 (Minn. Ct. App. 1998). For example, in *Wong Ken*, an insured's violation of a "concealment or fraud" clause was established as a matter of law where the uncontradicted evidence showed that the insured reported $85,000 in false living expenses when, in fact, he lived in the damaged home during the repair process. 685 So. 2d at 1003.

We reject Anchor's reliance upon *Pryor v. Oak Ridge Development Corp.*, 119 So. 326 (Fla. 1928), for the proposition that "*any* impact to value renders a fraudulent misrepresentation material." In *Pryor*, the supreme court stated: "If any pecuniary loss is shown to have resulted, the court

---

[1] The scope of this statement in *Alvarez* is curtailed by the court's recognition that the jury in that case was instructed that "[o]verestimating the value, a mistake, or inadvertence is not sufficient to void the policy." 305 So. 3d at 7 n.1.

will not inquire into the extent of the injury; it is sufficient if the party misled has been very slightly prejudiced, if the amount is at all appreciable." 119 So. at 1093. However, this quote from *Pryor* discusses the requirement that fraud must have "resulting pecuniary damage" to be actionable. *Id.* *Pryor* did not involve an insurance claim and does not stand for the proposition that any misstatement in value in a Sworn Proof of Loss is automatically material.

An insured's correction of an earlier misstatement is something the jury may consider in making a materiality determination. *See Haiman*, 798 So. 2d at 812 (recognizing that the insured's correction of an inflated damage estimate may be considered by the finder of fact on the existence of a material misrepresentation that voids coverage).[2]

Most "concealment or fraud" clauses contain, or have been construed to contain, a requirement that a post-loss concealment or misrepresentation be intentional.

To void coverage under such a clause after a loss, the insurer must show "a wi[l]lful, purposeful misrepresentation of facts having substantial materiality under circumstances to which the law would attribute the intention to defraud, . . . that is, cheat, deceive and cause the insurer to do other than that which would have been done had the truth been told." *Freundlich v. Ace Ins. Co. of Midwest*, No. 17-24435-CIV, 2018 WL 6261514, at *2 (S.D. Fla. Sept. 6, 2018) (citation omitted). Mere mistakes or errors in calculations will not suffice to void coverage "when these flow from the mistaken good faith judgment or opinion of the assured or his agents." *J & H Auto Trim Co. v. Bellefonte Ins. Co.*, 677 F.2d 1365, 1372 (11th Cir. 1982) (quoting *Chaachou v. Am. Central Ins. Co.*, 241 F.2d 889, 893 (5th Cir. 1957)); *see also* H.D. Warren, Annotation, *Overvaluation in Proof of Loss of Property Insured as Fraud Avoiding Fire Insurance Policy*, 16 A.L.R.3d 774 (1967) ("It is well settled that where an insured person, in making proof of loss . . . , overestimates through mistake or inadvertence, the value of the property destroyed, the overvaluation does not amount to fraud sufficient to avoid the policy.").

---

[2] Anchor points out that in *Schneer v. Allstate Indemnity Co.*, 767 So. 2d 485, 486 (Fla. 3d DCA 2000), a jury found that the insureds intentionally misrepresented a material fact by submitting an inflated personal contents claim of $67,000, even though they later amended it to $18,000. Notably, though, the misrepresentation issue was still submitted to a jury for determination. The issues on appeal in *Schneer* involved the admissibility of expert testimony and divisibility of an insurance policy. The case does not hold that a correction to an earlier misstatement is irrelevant to the materiality issue.

Because reasonable persons "may differ as to the values which they place on particular objects, the rule voiding a policy of insurance will not apply in its severity unless the proof of the false swearing was such that no other conclusion can be drawn than that a purposeful misrepresentation was intended." *Berkshire Mut. Ins. Co. v. Moffett*, 378 F.2d 1007, 1012 (5th Cir. 1967) (applying Florida law). Thus, "an overestimate of the value of goods lost in a fire, an error in judgment with respect to fixing a value, a mistake, or an inadvertence, will not render an insurance contract void." *Id.* In short, "[c]ontractors or adjusters may significantly differ in their estimates, and [the court] cannot presume that one estimate, merely because it is excessively higher, is rife with fraud." *El-Ad Residences at Miramar Condo. Ass'n, v. Mt. Hawley Ins. Co.*, No. 09-60723-CIV, 2010 WL 8961438, at *7 (S.D. Fla. Sept. 28, 2010). "Mere overvaluation is not, in the absence of fraud, such a misrepresentation as will avoid the policy." Steven Plitt et al., 6A *Couch on Insurance* § 93:8 (3d. ed. 2020 update).

### *U.S. Fire Insurance Co. v. Dickerson*

A century ago, the Florida Supreme Court read into a policy the requirement that a post-loss misrepresentation be intentional to void the policy.

In *U.S. Fire Insurance Co. v. Dickerson*, 90 So. 613 (Fla. 1921), an insured filed suit to recover benefits under an insurance policy. The insurance company raised the affirmative defense that the insured had violated the "concealment or fraud" provision of the policy, which provided:

> This entire policy shall be void if the insured has concealed or misrepresented, in writing or otherwise, any material fact or circumstance concerning this insurance, or the subject thereof, or if the interest of the insured in the property be not truly stated herein, or in case of any fraud or false swearing by the insured touching any matter relating to this insurance, or the subject thereof, whether before or after loss.

*Id.* at 614. That provision did not contain a specification that the insured's concealment or misrepresentation had to be intentional to void the policy.

On the affirmative defense, the trial judge in *Dickerson* instructed the jury that "the [insurance company] would be required to show, not only that the plaintiff swore falsely, but that her oath was knowingly and

13

willfully false and made for the purpose and with the intent of deceiving and defrauding the [insurance company]." *Id.* at 618.

The Florida Supreme Court held that the trial court had properly charged the jury, explaining that "the element of fraud must be present in any false swearing by the complainant in the proof of loss":

> ***This instruction was correct and contained no statement that was in variance with the law in such cases*** or the issues tendered by the plea. . . . The charge complained of was not erroneous, in that it announced the doctrine that ***the element of fraud must be present in any false swearing by the complainant in the proof of loss***. The courts, almost without exception, hold to the doctrine that, in order to vitiate a claim for loss of property under a fire insurance policy by false swearing as to the goods destroyed or damaged, ***the element of fraud must be present***, and in this respect the charge as given by the court is in line with the authorities in this country.

*Id.* (emphasis added).

### *Universal Property & Casualty Insurance Co. v. Johnson*

Taking an approach that departs from *Dickerson*, the First District has interpreted a "concealment or fraud" clause substantively identical to the one here at issue, although in the context of a misrepresentation on an insurance application, and held that a false statement need not be intentional to void the policy. *Universal Prop. & Cas. Ins. Co. v. Johnson*, 114 So. 3d 1031, 1033–36 (Fla. 1st DCA 2013). The court reasoned that "given the language of subsection [2.a.(1)], subsection [2.a.(3)] would be superfluous if a 'false statement' under [2.a.(3)] included only intentionally false statements." *Id.* at 1036.

Unlike this case, *Johnson* involved the application of a statute, section 627.409(1), Florida Statutes, which deals with misrepresentations in insurance applications and allows an insurer to deny recovery for nonintentional misstatements *on an application* that materially affect the risk. *Id.* at 1033–36. *Johnson* presumably could have applied the statute to trump the language of the policy,[3] because the statute is consistent with

---

[3] In *Green v. Life & Health of America*, 704 So. 2d 1386, 1392 (Fla. 1998), the Florida Supreme Court held that "an insured's truthful answers on an insurance application according to the best of the insured's 'knowledge and belief,' do not

an established principle of contract law that even an innocent misrepresentation is a sufficient ground for rescission of a contract that was induced by the misrepresentation.  *Id.* at 1035.  It is well-established in Florida that a misrepresentation in an insurance application need *not* be intentional or knowing to later void the policy.  *See Cont'l Assurance Co. v. Carroll*, 485 So. 2d 406, 409 (Fla. 1986) ("The plain meaning of the statute indicates that, where either an insurer would have altered the policy's terms had it known the true facts or the misstatement materially affects risk, a nonintentional misstatement in an application will prevent recovery under an insurance policy.").  This makes sense because the insured's state of mind in filling out an insurance application has nothing to do with the company's decision to assume the risk of the policy.  The insurance company bases the decision to extend coverage based on the existence of material facts; the obligation is on the insured to ensure that those facts are correct.

Although it was unnecessary to do so because the case was controlled by statute, *Johnson* went on to construe the meaning of the term "false statement" in section 2.a.(3) of the policy, but it failed to address the ordinary meaning of the term "false statement."

Black's Law Dictionary defines a "false statement" as "[a]n untrue statement knowingly made with the intent to mislead." *Statement*, Black's Law Dictionary (11th ed. 2019).  Similarly, Merriam Webster's Online Dictionary provides the following "legal definition" of the word "false"—"2 a: not true or correct *especially*: intentionally or knowingly untrue or incorrect." *False*, Merriam-Webster's Online Dictionary, https://www.merriamwebster.com/dictionary/false (last visited Apr. 5, 2021) (legal definition).  Indeed, in jurisprudence, "the word 'false' implies something more than mere untruth: it imports knowledge and a specific intent to deceive." *State v. Tedesco*, 397 A.2d 1352, 1358 (Conn. 1978).  Thus, the more common meaning of the term "false statement" in the legal context is one that includes an element of intent.  At a minimum, the term is ambiguous because it can mean either an "untrue statement" or an

---

constitute misstatements within the meaning of section 627.409, Florida Statutes (1993), and therefore cannot provide the grounds for the insurer's rescission of the insurance policy."  Although *Green* contains dicta about parties' freedom to contract around insurance statutes, section 627.409 was never implicated in that case, because it was undisputed that the insured did not know of his medical condition and thus he had "not been shown to have intentionally or innocently misrepresented any facts within his knowledge and belief." *Id.* at 1390.  By contrast, in *Johnson*, there was no indication that the insurance application contained the "knowledge and belief" limitation.

"intentionally untrue statement." And an ambiguous contract should be construed against the drafter.

While it is true that contracts generally should not be interpreted in a way that renders a portion superfluous, in this case it is unavoidable. No matter how one interprets part 2.a.(3) ("Made material false statements"), some portion of the "Concealment or Fraud" provision will be rendered superfluous. For example, the *Johnson* court's interpretation of part 2.a.(3) would render superfluous the requirement in part 2.a.(1) that a misrepresentation must be intentional to void the policy.

*Johnson* is best understood as the First District's refusal to construe the policy in a way that would operate as a waiver of an insurer's statutory right to rescind for innocent misrepresentations in an insurance application that materially affect risk. We decline to extend *Johnson* to the post-loss context where a different dynamic between the insured and insurer is at play. To apply *Johnson* here would be inconsistent with the Florida Supreme Court's holding in *Dickerson* that "the element of fraud must be present in any false swearing . . . in the proof of loss." 90 So. at 618.

To summarize, in the post-loss context, the term "false statement" in the "Concealment or Fraud" exclusion should be interpreted as including an element of intent because: (1) interpreting "false statement" as including an element of intent is more consistent with the ordinary meaning of the term; (2) any ambiguity in the term "false statement" should be construed against the drafter; (3) forfeiture is especially disfavored in the law after a loss has already occurred; (4) such an interpretation would not operate as a waiver of the insurer's statutory right to rescind for innocent misrepresentations in insurance applications that materially affect risk; and (5) such an interpretation is mandated by the Florida Supreme Court's holding in *Dickerson*.

Thus, contrary to Anchor's argument, we interpret the policy as requiring a showing that the insureds acted with fraudulent intent in submitting the original roofing estimate.

### *Mezadieu v. Safepoint Insurance Co.*

We distinguish this case from the recent decision in *Mezadieu v. Safepoint Insurance Co.*, ___ So. 3d ___, 2021 WL 1153052 (Fla. 4th DCA Mar. 26, 2021). There, the insured intentionally adopted an estimate that her attorney later conceded "should not have included $11,000 for damages to the kitchen." *Id.* at *2. The estimate "undisputedly included

16

at least $11,000 in repairs" for damage to the kitchen unrelated to the leak, even though the insured "clearly knew" that the kitchen had not been damaged by the leak. *Id.* at *2–*3. In short, the summary judgment evidence in *Mezadieu* established that the insured knew certain statements to the insurer were false. It was therefore unnecessary to reach the issue of whether the policy required a showing of the insured's intent under the same "Concealment or Fraud" exclusion that is involved in this case. This renders the *Mezadieu* court's discussion of *Johnson* to be dicta. Thus, *Mezadieu* does not change our conclusion that applying *Johnson* in the post-loss context is inconsistent with *Dickerson* and ignores the different considerations that come into play once a loss has already occurred.

### *Conclusion*

Regardless of whether a "material false statement" under the policy is limited to intentionally untrue statements, the trial court properly denied a directed verdict on the "Concealment or Fraud" issue. Although Anchor argues that the record leads to an "unavoidable" conclusion that the insureds acted with fraudulent intent, this argument is based upon Anchor's one-sided interpretation of conflicting evidence.

A reasonable jury could have concluded that the insureds did not make any material false statements in connection with the Sworn Proof of Loss because, viewing the evidence in the light most favorable to the insureds, (1) there was no admission that the $52,800 roof replacement estimate was *false* as opposed to a mistake or merely a high estimate; (2) the insureds unequivocally denied having any input in its creation; (3) even on the cold pages of the record, Merced was an easily suggestible witness and the jury was free to reject his equivocal testimony about the creation of the roofing estimate; (4) Merced admitted that he was working long hours at the time and that he sometimes made mistakes; (5) Merced acknowledged that the cost of replacing a roof is higher in the immediate aftermath of a hurricane; (6) the Sworn Proof of Loss did not seek more than the actual costs because Merced's mistakes led to a total request for $20,000 less than the total damages; (7) the Sworn Proof of Loss was submitted after Anchor had already completed its investigation and denied coverage; and (8) the public adjuster corrected the roofing estimate before Anchor made any argument that it was inflated.

While a statement as to value is ordinarily material, a reasonable jury could have concluded that the high roofing estimate was not reasonably relevant to Anchor's investigation under the specific facts of this case. A reasonable view of the evidence is that once Anchor had already inspected

17

the roof and denied coverage for it, the company was in an adversarial position with the insureds and it would not have placed much importance on the insureds' initial estimate of the roofing cost, particularly where the estimate was later corrected, and Anchor could have obtained its own estimate at any time. In short, a reasonable jury could have concluded that the high initial roofing estimate was not material because it was not likely to affect the conduct or investigation of a reasonable insurer in Anchor's position—i.e., an insurer that had already inspected the roof, completed its investigation, and denied coverage.

We agree with the trial judge's thoughtful and well-reasoned order in denying the motion notwithstanding the verdict. As the trial judge wrote, there was conflicting evidence regarding the insureds' state of mind in presenting the Sworn Proof of Loss:

> In summary, [Anchor] has not demonstrated that there is no evidence upon which the jury could have relied when it found that [Anchor] failed to prove that either George or Alex intentionally concealed or misrepresented any material fact, engaged in fraudulent conduct, or made a material false statement. In accord with the above and on the basis that there was evidence from which the jury could reasonably infer and conclude that Plaintiffs did not intend to commit fraud or concealment, that their initial "estimate" was just that—an estimate which may have been high but possibly even accurate due to its close temporal proximity to a hurricane and the ultimate reduction in consultation with the adjuster, as well as credibility determinations based on the conflicted testimony as to who made the estimate and how, the Court denies the Defendant's Motion for Directed Verdict.

We have considered the other argument raised and conclude that the trial judge did not abuse his discretion in denying the motion for a new trial.

*Affirmed.*

WARNER, J., concurs.
ARTAU, J., concurs in part and dissents in part with opinion.

ARTAU, J., concurring in part and dissenting in part.

While I concur in result with the majority because this case presented conflicting evidence upon which the jury could have relied when it found

the insurer failed to prove that the insured had made materially false statements, I dissent as to the majority's interpretation of the insurance policy which conflicts with our recent opinion in *Mezadieu v. Safepoint Insurance Co.*, ___ So. 3d ___, 2021 WL 1153052 (Fla. 4th DCA Mar. 26, 2021).

*Mezadieu* interpreted the same insurance policy language at issue in this case. *Id.* at \*2. The operative policy language precludes insurance coverage where an insured: "(1) *Intentionally* concealed or misrepresented any material fact or circumstance; (2) Engaged in fraudulent conduct; *or* (3) Made *material false statements*[.]" *Id.* (emphasis added).

Contrary to the majority opinion, *Mezadieu* held that intent is not required when proving that an insured made materially false statements under subsection (3) of the operative policy language. *See id.* at \*3 ("[A] showing of intent is not required under the policy's concealment or fraud provision.") (citing *Universal Prop. & Cas. Ins. Co. v. Johnson*, 114 So. 3d 1031, 1036 (Fla. 1st DCA 2013), and *Privilege Underwriters Reciprocal Exch. v. Clark*, 174 So. 3d 1028, 1031 (Fla. 5th DCA 2015)).

A textual analysis of the operative policy language is consistent with our holding in *Mezadieu*. The disjunctive use of "or" before subsection (3), without repeating the term—"intentionally"—as utilized in subsection (1), unambiguously renders intent to be unnecessary when an insurance company invokes subsection (3)—"material false statements"—in defense of a claim.

In addition, because subsection (1) already covers intentional misrepresentations, the majority's interpretation of the policy language would render subsection (3) to be superfluous or meaningless because it would do nothing more than repeat subsection (1) if we were to read an intent requirement into it. *See Johnson*, 114 So. 3d at 1036 ("[A] contract will not be interpreted in such a way as to render a provision meaningless when there is a reasonable interpretation that does not do so." (citing *Moore v. State Farm Mut. Auto. Ins. Co.*, 916 So. 2d 871, 877 (Fla. 2d DCA 2005))); *see also Mezadieu*, 2021 WL 1153052 at \*3 ("'[G]iven the language of subsection [(1)], subsection [(3)] would be superfluous if a 'false statement' under [(3)] included only intentionally false statements.'" (quoting *Johnson*, 114 So. 3d at 1036)).

While the majority attempts to distinguish *Mezadieu* and treat it as dicta on the basis that it relied upon *Johnson* which addressed materially false statements in the procurement of insurance on an issue that is regulated by a statute, the policy provision being interpreted covers

materially false statements by an insured "whether before or after a loss[.]" In other words, the operative provision we are interpreting applies equally, from a contractual perspective, to both materially false statements in the procurement of insurance and a materially false statements in the filing of an insurance claim. Moreover, *Mezadieu* is indistinguishable as it applied the same operative policy provision to materially false statements in the filing of an insurance case—no different than here.

Nonetheless, the majority characterizes *Mezadieu*'s holding that intent is not required as dicta because *Mezadieu* also concluded, in the alternative, that "it cannot be said that the [insured] did not intend to rely on the false statements[,]" as she "made no attempt to revise the estimate" prepared by her loss consultant. *Id.* at *3.

Although what constitutes dicta may be debatable under certain circumstances, our courts have long held that alternative holdings are not dicta. *See, e.g.*, *Woods v. Interstate Realty Co.*, 337 U.S. 535, 537 (1949) ("But where a decision rests on two or more grounds, none can be relegated to the category of obiter dictum."); *Richmond Screw Anchor Co. v. United States*, 275 U.S. 331, 340 (1928) ("It does not make a reason given for a conclusion in a case obiter dictum, because it is only one of two reasons for the same conclusion."); *see also Paterson v. Brafman*, 530 So. 2d 499, 501 n.4 (Fla. 3d DCA 1988) ("The fact that this was an alternative holding of the court does not detract from its binding authority." (citing *Clemons v. Flagler Hosp., Inc.*, 385 So. 2d 1134, 1136 n.3 (Fla. 5th DCA 1980))).

Even assuming arguendo that the majority's view that an alternative holding under these circumstances is dicta, that would mean the majority's interpretation of the insurance policy here is also dicta. Because the jury determined that any false statements made by the insured were not material, the majority did not need to reach the issue of whether intent is required under the operative provision of the policy. *See Haiman v. Fed. Ins. Co.*, 798 So. 2d 811, 811 (Fla. 4th DCA 2001) ("[M]ateriality is a question of fact to be determined by the trier of fact.").

Thus, while I respectfully dissent from the majority's dicta that the insurance policy provision is ambiguous and subject to a different interpretation than articulated in this court's prior panel opinion in *Mezadieu*, I concur in result because the jury determined that any false statements made by the insured were not material.

*       *       *

***Not final until disposition of timely filed motion for rehearing.***

20